STATE v. MARVIN SIEBKE.[1]

December 10, 1943.

No. 33,565.

[1]Reported in 12 N. W. (2d) 186.

*Lauerman & Pfeiffer,* for appellant.

*J. A. A. Burnquist,* Attorney General, *William C. Green,* Assistant Attorney General, and *Russell L. Frazee,* County Attorney, for the State.

JULIUS J. OLSON, JUSTICE.

Convicted of the crime of carnal knowledge of the complaining witness, Marjorie Retzlaff, a young girl lacking six days of being 12 years of age when the claimed offense took place, defendant ap-

peals from an order denying his motion to set aside the verdict, the sentence imposed, the judgment of conviction, the verdict, and for a new trial.

The Retzlaff family resides at Olivia toward the northerly outskirts thereof. On the evening of July 1, 1942, the family drove to the business section of the town in the family car to do some shopping. Marjorie and her younger brother accompanied their parents. They shopped and had shoes repaired for Marjorie and the little boy. Shortly after 11 o'clock they were ready to go home, but in the meantime Marjorie had gone to the depot to mail a letter to her brother, who was in military service at Kodiak, Alaska. While she was on this errand the family tried to find her, but, failing so to do and thinking that she had started walking home, they drove home, only to find when they got there that she had not yet arrived. In the meantime, Marjorie, upon returning from the depot to the main street of the town where her people had been and where the car had been parked, failed to find either the car or the members of her family. At about 11:30 she started walking home, only some six blocks distant. On her way, the driver of a car stopped and invited her to ride with him. She declined the invitation. She continued on her way, but had walked only a short distance when the same driver again stopped and again invited her to ride. That invitation too was declined. She observed, however, that the car went around the block and came back on the next street toward the intersecting one on which she was walking. Arriving at the street crossing, she stopped to let the car pass. Instead of doing so, the driver stopped immediately in front of her. There was then no invitation to go riding, but strong-arm methods instead were employed. As soon as he got out of the car he forcibly took her and placed her in the front seat on the left side so that she became wedged in between him and the left front door. He drove to a grove some distance north of town, drove his car into it, and while there the criminal act took place. After accomplishing his purpose, the victim was taken back to the Retzlaff home, where defendant stopped the car a short distance from

the driveway, let the girl out, and then disappeared. It was then past midnight.

Marjorie's failure to return home caused her parents much anxiety, the mother being especially disturbed. Both parents remained up looking for her. As a matter of fact, because of the mother's disturbed and excited state of mind, Mr. Retzlaff made two trips to town searching for her, and in each instance consulted Mr. Nordgren, the chief of police at Olivia. Upon his return home after the second trip uptown, the child not having yet returned, the father stayed in the house until he saw a car coming toward the house from the next block, after which he went out and stationed himself in the yard behind a large tree. The car stopped near the driveway, and Marjorie got out and came running toward the house. She showed her father the dollar bill which the man had given her and said: "Next time he is going to give me five." The father testified that the car was a model A Ford. He instructed the girl to watch the car that had brought her home, while he got busy trying to start his own car for the purpose of overtaking the disappearing vehicle. There was some delay, for he had trouble getting his car started. His daughter got into the car with him, and they drove at least two miles before they observed that the car they had followed was not the one involved. While so driving, Marjorie hurriedly and in a few words told her father that her bloomers had been taken from her and of what had happened. Again Mr. Retzlaff drove to Olivia and conferred with Mr. Nordgren, who found Marjorie "excited and nervous." He talked with her there about 15 minutes about what had happened to her that evening and called up two doctors, but neither doctor was available. We may infer that the chief of police wanted them for the purpose of examining the girl. The parents, Marjorie, and Nordgren then drove out to the grove, but found nothing there except car tracks, which could not be identified because of vegetation.

It is apparent that Mr. Nordgren had formed an opinion that defendant had something to do with the commission of the offense. During the evening of July 3 he observed defendant and two other

men sitting in front of the Yellowstone Cafe. Mrs. Retzlaff and Marjorie had their car parked nearby. Seeing them, he invited the girl to walk toward the place where these men were sitting. As soon as Marjorie saw defendant she exclaimed with apparent agitation, "That is the man. I am afraid." Mr. Nordgren, who then was only a short distance behind her, immediately proceeded to cross the street toward the place where these men were sitting, but defendant hurriedly disappeared. Nordgren's search for him in Olivia that evening failed to locate him.

Later that evening, Mr. Nordgren, evidently considering his jurisdiction limited to the corporate limits of Olivia, secured the assistance of L. R. North, the deputy sheriff, to aid him in the investigation of the offense and the apprehension of the wrongdoer. They drove to the home of defendant's father, where defendant lived, and found him there. The time was then about midnight. Defendant was called from his room upstairs, and Mr. Nordgren informed him: "I would like to have you come into town with us to check up on an investigation." Nothing was said as to the nature of the investigation or the subject matter to be investigated. Defendant made no objection. He got into the back seat, North driving and Nordgren sitting to his right in the front seat. The three then drove past the grove where the offense had taken place. While so driving past the grove and before going to the Retzlaff home, Mr. Nordgren took a flashlight and pointed it in the direction of the grove, saying to Mr. North, "It's a beautiful grove there without any buildings." Defendant interjected the remark, "I don't know anything about that grove, I don't know anything about it." Up to this point no one had said anything to defendant about any offense or that he was suspected of any specific criminal act. No occasion apparently had arisen to bring forth this remark by defendant. They then drove to the Retzlaff home, where the family was awakened. Then and there, Marjorie, in the presence of defendant, her parents, Mr. Nordgren, and Mr. North, positively and unequivocally identified defendant as her assailant. Mr. North promptly took charge of him and lodged him in jail that night.

The next day, after a further investigation by the chief of police, the deputy sheriff, and the county attorney had disclosed the presence at defendant's home of two model A Fords, in one of which there were a metal toolbox and a rope, the county attorney promptly proceeded with an investigation, which included at least two conferences with defendant while in jail. From the testimony given, it is apparent that defendant in many respects made admissions to the county attorney which go to sustain the state's claim that defendant was the man who had assaulted Marjorie.

In addition to what has been related, we may add that Marjorie testified that before the act was consummated defendant removed his trousers, which she described as black with white stripes running up and down; that he wore a white shirt with dots; a black felt hat; that his undergarment was of "one-piece, white" and had "short legs"; that while the act of intercourse was taking place she tried to push him away and noticed that he had "awful big" eyes. The county attorney, too, observed this peculiarity, because during his examination of defendant in the county jail defendant became angry and his large and "fiery" eyes also impressed him.

That defendant was in Olivia during that evening and close to midnight is abundantly shown; also that he came to town in his own model A Ford and spent at least an hour and until closing time in the municipal liquor store with a friend. He admitted to the county attorney that the clothes and hat he was wearing when arrested and when in jail were the same clothes he wore on July 1. These trousers and hat were not black, but dark blue, with white stripes running up and down the trousers, and his shirt was light-colored. His undergarment was a one-piece affair and had "short legs." Examination of defendant's car disclosed that there was a metal toolbox immediately back of the driver's seat. This corroborates Marjorie's testimony that while they were in the back seat one of her legs came in contact with a hard box.

■ If this were a civil action we might well dispose of many assignments of errors as being inadequate to raise an issue. But, since it is a criminal case, we are by Minn. St. 1941, § 632.06

(Mason St. 1927, § 10752), required to examine and "render judgment upon the record before" us. The statute reads:

"No assignment of errors or joinder in error shall be necessary upon any writ of error issued or appeal taken in a criminal case, but on the return thereto the court shall proceed and render judgment upon the record before it. If the court affirms the judgment, it shall direct the sentence pronounced to be executed, and the same shall be executed accordingly. If it reverses such judgment, it shall either direct a new trial, or that the defendant be absolutely discharged, as the case may require."

■ Under the statute and our decision law, the crime of carnal knowledge is a separate and distinct offense from that of rape. Minn. St. 1941, § 617.02 (Mason St. 1927, § 10125), provides: "Every person who shall carnally know and abuse any female child under the age of 18 years shall be punished." We have held that under this law a female under 18 years of age cannot "consent and her willingness or unwillingness is immaterial"; that her "consent is no defence to a prosecution"; and that her "chastity or reputation for chastity" is likewise "immaterial." 5 Dunnell, Dig. § 8240, and cases cited in notes 92 and 93. And a conviction may rest upon the uncorroborated testimony of the prosecutrix, unless such testimony is discredited by facts and circumstances casting doubt upon its truth. *Id.* & Supp. § 8244, and cases in notes 12 and 13.

■ Defendant devotes most of his brief to the assertion that the commission of the act is so lacking in evidentiary support as not to justify "the verdict of 'guilty' beyond a reasonable doubt." We think the facts recited amply support the verdict. *Cf.* State v. Brown, 185 Minn. 446, 241 N. W. 591; State v. Marudas, 187 Minn. 138, 244 N. W. 549; State v. Bauer, 189 Minn. 280, 249 N. W. 40.

■ With respect to defendant's claimed alibi, we find the same situation. Only a fact problem was presented, and it was for the jury to say whether that defense was sufficiently shown. That defense at most has for its support only claims of doubtful worth. The time element presents only a very slight discrepancy. The

issue was one of fact, and we hold that the verdict is sustained by the record.

■ The same we think is true as to the sufficiency of defendant's identification as the culprit who committed the crime. Marjorie positively identified him the moment she saw him on the evening of July 3, and again at the Retzlaff home later that night in the immediate presence of defendant, her parents, and the officers who had brought defendant there. She was just as positive at the trial. She was put to severe tests under long and searching cross-examination by thoroughly capable counsel, both at the preliminary hearing and at the trial. To her, these were ordeals not easy to meet and withstand. She did remarkably well as to both. Since "great latitude is allowed in the admission of evidence to prove the identity of the accused" (2 Dunnell, Dig. & Supp. § 2468d), we think the recited facts on this phase fully sustain the verdict. Much of counsel's argument here could properly be made, and undoubtedly was made, to the triers of fact. They found against defendant. It is not for us to say, as a matter of law, that the proof here adduced was insufficient. Were we to do so we should be going far beyond our appropriate field as a court of review.

■ Defendant suspects that in some way he was harmed, because two jurors, Lee Thrush and Arthur Olson, during the noon recess of the second day of trial, "with time on their hands" and "without any particular reason," drove out "on the road which runs along and near" the involved grove of trees. Juror Olson used his own car on the trip, and Mr. Thrush sat with him in the front seat. Both men are in agreement that all they did on the trip "was to drive down the main road going past this grove"; that neither "got out of the car," nor was the car stopped on the trip except momentarily when it was turned around to go back to Olivia. Neither attempted to "study, view, inspect or examine the premises in question." In the language of Mr. Olson: "About all your affiant can state is that his trip out along the road past the grove was one of many acts that people sometimes do, when they have time on their hands, without any particular reason." They observed nothing on

the trip, nor did they in fact learn "anything either for or against the interests of the defendant."

The rule to be applied in matters of this nature is well stated in 5 Dunnell, Dig. & Supp. § 7104. (The cases are cited in notes 5 and 6.)

"* * * To justify a new trial there must not only be misconduct on the part of the jury but also prejudice to the moving party. If it does not appear that the misconduct was occasioned by the prevailing party or any one in his behalf, and if it does not indicate any improper bias upon the jurors' minds, and the court cannot see that it either had or might have had an effect unfavorable to the party moving for a new trial, the verdict ought not to be set aside. Where the misconduct is without the knowledge or participation of the successful party, much liberality is indulged in sustaining the verdict, notwithstanding such misconduct."

■ As to whether this court should grant a new trial for misconduct of this type, we are governed by the usual rule that the trial court will not be reversed on appeal except for a clear abuse of discretion, and this is particularly true where the action of that court is based on conflicting affidavits. *Id.* & Supp. § 7105, and cases in notes. In Thoreson v. Quinn, 126 Minn. 48, 147 N. W. 716, a well-considered opinion written by Judge Taylor, this problem is fully and adequately covered, and nothing more need be said than what was there so carefully considered and decided as the rules to be applied. Our latest decision on this phase is State v. Clow, 215 Minn. 380, 10 N. W. (2d) 359.

■ In this case the offense took place July 1, 1942. The trial commenced November 16, and the trip taken by the jurors was made during the noon recess of November 17. How the jurors, while riding in a car without stopping, could observe from the highway anything likely to be of detriment or advantage to either side, is not easy to see. Obviously, no tracks made by a car or other vehicle in July could be traced in November. The criminal act took place within the grove when the foliage was in full growth

and afforded the seclusion deemed desirable by defendant. How, then, could this casual trip in November result in anything prejudicial or harmful to defendant? Nothing has been suggested except possibilities so remote from realities as to lead nowhere.

■ The taking of testimony was finished on November 18. A recess was then taken until the 19th, when counsel's closing arguments were made and the court's instruction given. The charge was such as to call for no criticism or suggestions from counsel on either side, although the court asked counsel, "Are there any suggestions?" The closing words of the charge were: "This being a criminal case, all 12 jurors must agree upon the verdict." About 11 o'clock in the forenoon of November 20, the jury came back into court and in answer to the court's inquiry, "So far you have been unable to agree?" the foreman answered in the affirmative. The court wanted to know "how the vote is." The foreman answered: "In the first ballot it stood 7 to 5 for acquittal; in the second 6 to 6, then it was 7 to 5 again, and now we stand 6 to 6." The court remarked that the vote "isn't very close," and proceeded further to instruct the jury in respect to their duties carefully to consider the fact questions presented, since "the case must be decided at some time." Their attention was called to the fact that they were "selected in the same manner and from the same source from which any future jury must be selected, and that there is no reason to suppose that the case will ever be submitted to 12 persons more intelligent, more impartial, or more competent to decide" the issues. They were told that as to each of them the verdict must be "his own," "the result of his own convictions," and not a "mere acquiescence in the conclusions of his fellows"; that they should "examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other," but should "not sacrifice their own opinions," but rather "listen to each other and attempt to arrive, if possible, at a unanimous opinion. If it is impossible, why then that will have to be taken care of." The foreman of the jury asked: "Can we agree to disagree?" The court replied: "You may disagree, but whether it is to be considered that it is impos-

sible for you to agree that is for me to say, but [to arrive at a verdict] you will have to agree to 'guilty' or 'not guilty.' Give the matter some more consideration." The jury again retired and at two o'clock that afternoon brought in a verdict of guilty "as charged in the information."

Defendant has assigned the portion of the charge last above quoted as prejudicial. He construes it to mean that the court told the jury that they would have to agree, otherwise they would not be discharged. But it will be noted that no exception was taken to the charge or suggestion made that such was the meaning of the quoted language, or that the court so intended. We should bear in mind that what the court had been talking about was unanimity of opinion before a verdict could be reached; that it was for the court to determine whether the jury should continue their deliberations. What the court intended to say, but did not in so many words, is that portion we have included in brackets in the quotation.

We think this error is of the type falling well within the rule laid down in Steinbauer v. Stone, 85 Minn. 274, 278, 88 N. W. 754, 755, and what was there said in deciding this issue is equally applicable here:

"If counsel deemed those instructions misleading, or likely to prejudice his client's cause before the jury, the attention of the court should have been called to the matter, so that the mistake— for it was nothing more than a mistake—could have been corrected before the jury retired."

We there concluded that a party may not—

"secure a new trial for some technical error or mistake which could have been corrected had attention been called to it at the trial; and counsel should still perform their duty to the court, and call attention to obviously unintentional misstatements and verbal errors in the charge to the jury, that the same may be corrected, if they are deemed at all likely to be misleading. Of course, this does not apply to instructions on some controlling proposition of law, but to such misstatements of fact or technical inaccuracies in matters of

law or fact as are often likely to creep into a charge orally delivered to the jury."

To acquit or convict, the jury had been repeatedly told, in language free from doubt, there must be unanimity on their part. Obviously, counsel for defendant did not then think that there was error in the charge; otherwise he would have called the court's attention to what was clearly a "verbal error," "nothing more than a mistake," which "could" and undoubtedly would "have been corrected before the jury retired." The many cases bearing upon this question are cited in 6 Dunnell, Dig. & Supp. § 9798.

While there are other claimed errors, we think they do not require specific or separate treatment. We have covered all the features of the case which we feel deserve special consideration. Our conclusion is that the verdict and sentence find adequate support in the record and that no reversible errors appear.

Order and judgment of conviction affirmed. The sentence imposed by the trial court will be executed.

So ordered.

MR. JUSTICE LORING, absent because of accidental injuries, took no part in the consideration or decision of this case.

[1]Reported in 12 N. W. (2d) 192.