# STATE v. ROBERT M. DOAN.[1]

December 26, 1947.

No. 34,378.

[1]Reported in 30 N. W. (2d) 539.

*Martin Friedman* and *Rudolph Rautio,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Victor J. Michaelson,* Special Assistant Attorney General, and *Stanford Dodge,* County Attorney of Carlton county, for the State.

THOMAS GALLAGHER, JUSTICE.

On October 4, 1945, defendant was convicted of murder in the second degree. This is an appeal from the order denying his motion for a new trial.

On appeal, defendant asserts (1) that the evidence was not sufficient to sustain the verdict; and (2) that the trial court erred in giving certain supplementary instructions to the jury after the case had been submitted and after the jury had reported to the court and inadvertently disclosed to it that it stood seven to five for conviction.

About 5:10 a.m on June 6, 1945, fire was discovered in defendant's farm home, near Mahtowa, in Carlton county, then occupied by defendant's wife, Vivian, aged 28, and his four children, Dorrayne, seven years of age; Laurene, five; Darlene Kay, almost three; and Danny, about two months. Defendant was then absent from home, in Duluth. A neighbor, Bert Benson, who first discovered the fire, testified that upon his arrival at the burning house he saw car tracks in the frost on the road leading north from it, indicating that a car had left shortly prior to his arrival. The house was then al-

most destroyed, and it was impossible to do anything toward rescuing the occupants.

Later the same morning, defendant (at Duluth) was notified of the fire and arrived at his home about 10 a.m. that day. He was met by the parents of his wife, who lived a short distance away, and remained at their home for the next several days. Subsequently, to others he acknowledged that he had been at his home the morning of the fire and had left it at about 3:45 a.m. to return to Duluth. This information was not disclosed by defendant to his wife's parents, who first learned of it after defendant's subsequent arrest. Defendant admitted to the authorities and to his fellow workers that he had been home just prior to the fire.

The bodies of defendant's wife and four children were removed from the ruins and taken to the morgue at Barnum. A post-mortem was performed on June 8, 1945, and the results thereof disclosed that Vivian and the three oldest children each had sustained a fractured skull; that there was no evidence of smoke or carbon pigment in their respiratory tracts; and that their respective deaths resulted from the blows which had produced the skull fractures, and were not caused by fire or smoke. The examination of the youngest child disclosed smoke and carbon pigment in his respiratory tract, establishing that his death was caused by fire and smoke, and was not the result of a blow.

On Thursday, June 7, following the fire, and while the bodies of his wife and four children were at the morgue, defendant, with Vivian's mother and the latter's niece and son, drove to West Duluth, where the son had an appointment with a dentist. Defendant left the car near the dentist's office, stating that he was going to get a haircut. While absent, he telephoned a woman friend with whom he had been living as man and wife for some time previously. He asked her if she had read the account of the fire in the Duluth paper, and she replied that she had. She thereafter made a statement to the authorities that this was the first time she was aware that defendant was married. She further stated that dur-

ing the course of their acquaintance she had at times discussed marriage with defendant.

Following the post-mortem examination on Friday, June 8, Sheriff Sam Owens of St. Louis county was called by the Carlton county authorities and requested to come to Carlton. He had previously learned that defendant was at home the night of the fire and that he had left shortly before the fire was discovered. He had also learned of defendant's association with the woman above described. Owens and certain members of his staff arrived at the sheriff's office in Carlton about 1:00 a.m. Saturday, June 9, 1945. About 2:30 a.m., they arrived at the home of Vivian's parents, where defendant was sleeping, awakened him, and took him into custody. Upon his arrival at the Carlton county jail, Owens first spoke to defendant and stated:

"Bob, we might as well lay the cards on the table—that your wife and babies were murdered before your house was burned."

In response, defendant placed his head in his hands and said, "I didn't do it."

Defendant was then questioned concerning his association with the woman in Duluth and with reference to the time he had left his home the morning of the fire. These questions continued until about six o'clock Saturday morning, June 9, and thereafter on that date he was not questioned further. On the following day, Sunday, June 10, he was taken to the office of the judge of probate in the Carlton county courthouse for further examination by a deputy fire marshal and by Sheriff Owens.

In the examination by the deputy fire marshal, after being advised of his rights, defendant was placed under oath and questioned. The entire content of this examination was transcribed by a stenographer and offered in evidence by defendant at the trial. Therein he denied that he had murdered his wife and children. He stated that for some time prior to June 5, 1945, he had been employed by Wilmar Pearson as a scraper operator at the Duluth airport, and that on the night of June 5, about 8:30 p.m., he had been discharged from his

employment because of an accident resulting in damage to the equipment he was operating. He further disclosed that at that time he had been living with the woman in Duluth for a month or so. He stated that after he was discharged he left to see the business agent of his union; that he was "pretty sore"; that, being unable to find the business agent, he left for his home at Mahtowa, arriving there a little after 10 p.m.; that when he arrived home his family was in bed, but his wife heard him drive in; that while he ate a lunch he disclosed to her that he had lost his employment; that he left between 3:30 and 3:45 a.m. the next day to go back to Duluth after his wife had prepared breakfast for him.

Defendant further disclosed that there was a five-gallon can containing two or three gallons of gasoline in his basement the night of the fire. He also stated that six months to a year before this he had been having some trouble with the electric wiring; that it "kept burning out bulbs," but that the power company had finally fixed up the wiring. He stated that his wife knew of his relationship with the other woman and that he had had one argument about it with her—not a "fierce argument, just a discussion"; that he guessed the word "infatuation" would describe his feeling toward the other woman; that he had told this woman he would marry her, but that actually he "never intended to."

Asked what he meant by stating, as he had, that his "mind was a blank" the night of the fire, he replied, "I don't know what was the cause of the fire. My mind is a blank. I don't know nothing about it."

Defendant admitted that the examination by the deputy fire marshal was conducted in an ordinary, moderate tone and that no profanity was used or threats made at any time in connection therewith.

Defendant then indicated that he wished to speak to Mr. Yetka, the then county attorney. Following his conversation with Mr. Yetka, the latter dictated a statement (State's exhibit J) to the stenographer, which was received in evidence, wherein defendant stated, among other things:

"I, Robert Doan, having personally requested to make a personal statement to Frank Yetka, county attorney of Carlton County, relative to the deaths of my wife and four children and also in connection with the burning of my home, all of which took place on Wednesday morning, June 6th, 1945. I make this statement voluntarily at my own request and I have been advised by the county attorney that all indications are that I might be guilty of said offenses. No promises have been made to me and I have been advised that if I am guilty of murder that I will be prosecuted on that charge. I want to state, however, that I have not been feeling well for the past six or eight months. I have been under high tension during all this time and on numerous occasions when I got home I would be so nervous that I would snap back at my wife whenever she said anything. When I got fired at the airport in Duluth on June 5th I was so mad that I did not know what to do. I have a recollection of going home that night but I do not recall all the details. After I got home I do not remember what took place there except that I have a recollection that I kissed my wife and children good-bye when I left home between 3:30 and 3:45 in the morning. Just why I left at that hour and went to Duluth to the airport where I was fired I don't know, because even though I would have been promised a job I could not possibly have gone to work until one o'clock in the afternoon. I could just as well have stayed home until 10:00 or 11:00 o'clock in the forenoon before leaving for Duluth. I cannot explain my actions for leaving home except I was laboring under a severe strain. I fully realize that all the evidence points to me as having committed those offenses but I do not remember committing them but all indications are that I must have done it as I can see no possible change [sic] of anyone else being guilty. The reason I said on prior questioning by the sheriff that I kissed my wife and children good-bye before I left was due to the fact that I always did that on leaving home as I never left the house before without doing that but whether I did on this particular morning I could not swear to that fact under oath."

This statement was signed by defendant at about 3:00 p.m. Sunday, June 10.

Shortly thereafter, following further questioning by Sheriff Owens and further disclosures by defendant, a second statement (State's exhibit K) dictated by Owens, was transcribed by the stenographer, read to defendant, and voluntarily signed by him. Therein he stated:

"I, Robert Doan, hereby make the following statement of my own free will, no promises have been made me in consideration of this statement and no threats of any kind have been used against me. I realize that this statement may be used against me and with that understanding I voluntarily make and sign the same.

"On the night of the crime I left Duluth after talking with a man by the name of Monty Harris near the Lenox Hotel in Duluth and I would say that was around 9:00 to 9:10 p.m. I headed west and drove through Carlton and I think it was about 10:00 p.m. I arrived home not later than 10:20 p.m. The lights were all out and it seemed to me that everyone was in bed and asleep but as I went to enter the door my wife turned on the light and opened the door. I had lunch and shortly after that during the course of conversation with my wife she thought that it would be a good idea to quit my job at the airport because of this man Mattson and that I ought to stay a little more at home and stay away from this woman in Duluth. As I was terribly burned up and mad when I did get home this argument between my wife and I made things worse. I went to bed but did not sleep very much and my wife continued to quarrel with me and I got up and picked up a baseball bat which was in the entry-way and I walked over and know that I killed her while she was in bed. I then came out of her bedroom through the kitchen and into the other room where three of my children were asleep and I hit each of them with the baseball bat. I never did touch the baby lying in its crib in the kitchen. After hitting the wife and three children with the bat I went downstairs where I had a five-gallon can of gasoline partly filled. I brought it up-

stairs, poured the gasoline on the floor, lit a match to it, immediately left, got in my car and drove to the airport in Duluth. I committed his [*sic*] crime about 3:30 a.m on Wednesday, June 6th, 1945."

Following the confession, in the presence of Undersheriff George McDowell of St. Louis county and Deputy Sheriff Arthur Rude of Carlton county, defendant said: "This is the first time my body has felt right since I made the confession. You can't realize how my body has been all tied up, and I am really beginning to relax."

Sheriff Owens testified that in connection with the oral examination of defendant the following conversation took place:

" 'All right, Bob, we are down to the baseball bat, these knives and the stove poker.' * * * 'All right, then, Bob, we are down to the baseball bat and the stove poker, isn't that right?' and he said, 'Yes, that's right.' I next then said, 'All right, Bob, what did you kill your wife and babies with?' and he put his head in his hands and he said, 'Well, maybe—' 'No, Bob, there can't be any maybe, there can't be any perhaps about it. What did you kill your wife and babies with?' and he answered, 'The baseball bat.'

"I said, 'Bob, who did you kill first?' and he said, 'I killed my wife first.' 'Then what did you do?' 'I went into the basement, into the kitchen, from the kitchen into the front room, from the front room into the bedroom and I killed my three babies and then I came out.' I said, 'Bob, but the baby in the kitchen in the crib was not killed before it was burned. Didn't you touch the baby?' He said, 'No, I didn't.' * * * 'Then what did you do after you killed your wife and the three babies?' 'I went downstairs.' 'Then what did you do?' 'Well, there was a can partly filled with gasoline.' 'All right then, what did you do?' 'I took that gasoline upstairs, I poured it on the kitchen floor.' 'All right then, what did you then do?' 'I lit a match to it.' 'All right then, what did you then do?' 'I went out and got in my car and I drove away.' "

Sheriff Owens further testified that after the confession (exhibit K) had been typed and read to defendant the only objection thereto

made by defendant before signing it was to the use of the word "quarrel" therein in describing his discussion with his wife just prior to the fire, but that he decided it was "as good a word as any," and signed the statement. All witnesses asserted that the examinations were conducted in ordinary conversational tones, without threats or coercion and without promises or inducements; and that defendant signed each statement freely. Sheriff Owens testified that immediately after the last statement had been signed defendant stood up, shook hands with him, and said, "Sam, you're a pretty good fellow."

Mrs. Flossie E. Olson, Vivian's mother, testified that for some time prior to the fire defendant "seemed to not care so much for his family as he had before, or for her, and he didn't seem to have so much to say to his children"; that for some months prior to the tragedy he had not taken them out to any great extent, and "he never stayed at home"; that after the fire he stayed at her house for several days, but did not mention his wife or children beyond once stating that "Vivian had been awful good to him"; that she had a talk with him on Friday following the fire wherein she said, "I just told him I wished he would mend his ways because Vivian and the babies would be waiting for him, and he said, 'I'll never meet Vivian,' and I said, 'Oh, yes, it can't be as bad as all that. There has been many a man has gone wrong, and they come back,' and I said, 'They'll still be waiting for you.' He said, 'No, I'll never meet them.' "

On June 21, 1945, following the confession, defendant was indicted for the crime of murder in the first degree in connection with the death of his wife, Vivian. He pleaded not guilty and was tried in Carlton county district court on July 18, 1945. The jury was unable to agree, and the trial court, upon motion by the state, acquiesced in by defendant, changed the venue for the next trial to the city of Duluth in St. Louis county. The second trial commenced September 10, 1945, and after two continuances was completed on October 1, 1945.

At this trial defendant denied that part of his statements which recited in substance that he had killed his wife and three children with a baseball bat and afterward poured gasoline on the floor and set fire to the house. He admitted that there was a baseball bat in the house and a gasoline can in the basement almost full of gasoline.

While defendant did not move that the testimony relative to the circumstances surrounding his signing the confession be heard outside the presence of the jury, he did object to its admission, claiming that it was obtained by coercion. In substance he testified, likewise before the jury, that when he was first arrested he was questioned from about 11:00 a.m. until about 5:00 p.m.; that he did not request the right to talk to Yetka; that he did not know Mr. Yetka; that he had not been questioned in an ordinary tone of voice, but that cursing and swearing at him by the authorities took place during the examination; that he kept telling Sheriff Owens that he had not committed the crime and knew nothing about it; that the sheriff then stated, "Well, this is going to go on until either you confess or sign—we will go right on"; that after he had been questioned he said that he "didn't feel very good" and "didn't seem to care very much for anything"; that after all the questioning, "it didn't seem to make any difference, and then I told him [Owens] to go dictate his statement, bring it in, and 'I'll sign anything.' He brought it in and I signed it."

No special instructions were requested by defendant with reference to the confession, and the trial court submitted for the jury's determination, without objection, the weight to be given thereto. No error with respect thereto was assigned either in the motion for new trial or upon appeal here.

The case was submitted to the jury the afternoon of October 2, 1945. The following day, October 3, at 1:10 p.m., the court called in the jury and stated:

"The Court: * * * What does your last ballot show? Don't tell me which you are divided, just the number.

"Mrs. Erickson [foreman]: Seven to five."

The court thereupon returned the jury to their room, with instructions to take another ballot without any deliberation. When the jury returned the foreman reported:

"Mrs. Erickson: Your Honor, it was seven guilty and five not guilty.

"The Court: The court didn't want to know which way you stood, but now it is out. I don't want that to be published, and I ask anyone who has heard it among the court attachés not to publish that fact.

"At this time the court will give you these additional instructions.

"The record may show that the defendant is present in court and that the assistant attorney general, Mr. Michaelson, is also present. The record may show Mr. Rautio [defendant's attorney] may have any exceptions to these instructions he desires."

The court thereupon gave certain additional instructions, including the following:

" * * * but it is to the interest of society that you should reconsider your differences and agree upon a verdict if you can that will not conflict with your own consciences.

* * * * *

"* * * No juror should sacrifice conscientious convictions, but when a juror finds his judgment holds to [sic] the judgment of a majority of the jury, he or she then should be induced to reconsider and review all the testimony submitted to determine whether he or she has given all the matters presented the consideration which they deserve.

"* * * We want to be particularly careful that no one feels that they have been coerced into a verdict; and, of course, if you can't agree, the court is not going to say that you have to agree, and we aren't going to resent it if you can't agree, and we aren't going to

be angry. At this time, the court feels that you have been out less than twenty-four hours and have deliberated much less than that, and we have no disposition at this time to discharge the jury.

"This case has been tried twice. I have been advised by the attorneys who are involved in the case that all the evidence that they can present in this case has been presented to you; no more is available at this time. It is not a likelihood that any more will be available; certainly not in the near future.

"* * * but, as I say, the case has been tried twice, and it certainly is to the interest of society that you attempt to agree on a verdict if you can agree on a verdict that squares with your own convictions and with your recollection of the testimony as presented in court."

■ The facts as recited clearly indicate that the evidence was sufficient to sustain the conviction of defendant for the crime of murder in the second degree. The jury found that the written confession, which defendant admits contains his signature, was made voluntarily. It is supported by other evidence reasonably tending to prove the *corpus delicti* beyond a reasonable doubt. The surrounding facts and circumstances, as testified to by witnesses who would have no occasion to testify falsely, corroborated the written statements in many details. Such evidence established defendant's presence at the time the crime was committed, as well as his knowledge of the presence of the baseball bat and gasoline, which, the confession states, were used in committing the crime. Under the established rule of this court, the evidence as described is sufficient to sustain the conviction. See, State v. Nordstrom, 146 Minn. 136, 178 N. W. 164; State v. McClain, 208 Minn. 91, 292 N. W. 753.

■ Defendant asserts that the supplementary instructions given by the trial court had the effect of coercing the jury into returning its verdict of guilty. We have examined the instructions carefully and do not agree with this contention. They were temperate, well-considered, and limited to a further instruction as to the obligation of the jury to agree if possible. There is no suggestion that the

agreement to be arrived at should be either for or against conviction. The members of the jury were specifically advised:

"* * * No juror should sacrifice conscientious convictions, * * *"; he "should not take an obstinate stand but should be willing to discuss all the points of testimony with his fellow jurors in a spirit of fairness. * * * that no one feels that they have been coerced into a verdict; and, * * * if you can't agree, the court is not going to say that you have to agree, and we aren't going to resent it if you can't agree, and we aren't going to be angry."

The only statement in such instructions which it is suggested constitutes coercion is that "when a juror finds his judgment holds to [sic] the judgment of a majority of the jury, he or she then should be induced to reconsider and review all the testimony submitted to determine whether he or she has given all the matters presented the consideration which they deserve." Certainly such language is far from an instruction or a demand that a minority of the jury should readjust its viewpoint to conform to the viewpoint of the majority or else incur the displeasure of the court. It is true that at the time this instruction was given the jury foreman had inadvertently informed the court that the jury then stood seven to five for conviction. This statement was made contrary to the court's specific directions not to reveal the division as it related to conviction or acquittal. We cannot see how the court's knowledge of the division had the effect of making its subsequent instructions improper or coercive, particularly in view of the temperate language used and the care taken by the court to advise the jurors that they should rediscuss all points of the testimony in a spirit of fairness and that the court would not resent it if they did not agree. The substantial time which expired subsequent to these additional instructions, before the jury finally agreed, is indicative that those in the minority were not coerced or stampeded into a change of viewpoint.

The general rule with reference to such instructions is well stated in Annotation, 109 A. L. R. 73, as follows:

"* * * it is well settled that a judge may with propriety include, within reasonable limits, in his instructions to a jury, urging them to agree on a verdict, some mention of such matters as the expense of the trial, the time taken to try and determine the case, the trouble and inconvenience involved, the number of times the case has been tried, and the fact that in the event of a disagreement it will have to be tried again, on the same pleadings and probably the same evidence, by another jury of equal capacity to determine the issues."

Instructions similar to those complained of here have frequently been held not to constitute reversible error. See, State v. Friend, 154 Minn. 428, 191 N. W. 926; State v. Siebke, 216 Minn. 181, 12 N. W. (2d) 186; State v. Richardson, 137 Iowa 591, 115 N. W. 220; Allen v. United States, 164 U. S. 492, 17 S. Ct. 154, 41 L. ed. 528; Barlow v. Foster, 149 Wis. 613, 136 N. W. 822. In particular, this court has held that the disclosure by a juror to the court as to how the jury stood before agreement was reached did not constitute reversible error. McNulty v. Stewart, 12 Minn. 319 (434).

■ Defendant contends that the record discloses that the court in effect informed the jury that it was not going to be discharged until it had complied with his further instructions to arrive at a verdict, and that such language in effect constituted coercion. There is nothing in the record to indicate that the trial court so instructed the jury. On the contrary, the instructions above quoted indicate the opposite. Therein the court stated:

"I will be constantly available until midnight. If you fail to reach a verdict at midnight, quarters will be provided for you by St. Louis County so that all of you can get a good night's sleep, and then you will have breakfast tomorrow morning. In case you do not arrive at a verdict today, you will resume your deliberations in the morning."

And further:

"You may retire to your jury-room now, and in a few minutes the bailiff will see that lunch is provided. As a matter of fact, it is already ordered, so that is all now."

Also:

"* * * if you can't agree, the court is not going to say that you have to agree, and we aren't going to resent it if you can't agree, and we aren't going to be angry. *At this time*, the court feels that you have been out less than twenty-four hours and have deliberated much less than that, and we have no disposition *at this time* to discharge the jury." (Italics supplied.)

■ Defendant finally asserts that the jury's finding of murder in the second degree is a compromise verdict and perverse and, as such, requires reversal here. The trial court correctly charged the jury as to the elements necessary to establish the crime of murder in either the first or second degree, the distinction, of course, resting upon whether the crime was premeditated or otherwise. The circumstances surrounding the commission of the crime and the confession made by defendant, in which the commission of the crime was recited in detail, would justify a verdict of either first or second degree murder, depending upon whether the jury should determine that defendant had or had not time for premeditation before the crime was committed. See, 2 Dunnell, Dig. & Supp. § 2486.

■ A number of other assignments of error are urged by defendant. We have considered them carefully. Without going into detail with reference thereto, we have arrived at the conclusion that none of them are of the materiality sufficient to require granting a new trial.

Affirmed.