## STATE v. JAMES ANDREW MARTIN.

211 N. W. 2d 765.

October 12, 1973—No. 43558.

*C. Paul Jones,* State Public Defender, and *Doris O. Huspeni,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *George M. Scott,* County Attorney, and *Theodore R. Rix, Michael McGlennen,* and *Vernon E. Bergstrom,* Assistant County Attorneys, for respondent.

Heard before Knutson, C. J., and Otis, Rogosheske, and Mac-Lauglin, JJ., and considered and decided en banc.

OTIS, JUSTICE.

This appeal from a conviction for robbery challenges the continued validity in Minnesota of the so-called "Allen" charge directed at deadlocked jurors. We hold that such instructions are no longer consistent with our concept of a fair trial and adopt in their place A. B. A. Standards Relating to Trial by Jury, § 5.4 (Approved Draft, 1968). Because the Allen charge was here given, and evidence reflecting on defendant's character was improperly received, we reverse.

■ Defense counsel on cross-examination elicited from a prosecution witness testimony that she had identified defendant from a photograph. On redirect, over defendant's objection, the prosecutor handed the witness in full view of the jury a so-called police mug shot photograph album from which the witness selected defendant's picture. Later in an apparent effort to minimize the prejudice, defense counsel introduced testimony that the defendant's previous offense was an ordinance violation. Not only have we condemned such disclosures by the prosecution, State v. Madison, 281 Minn. 170, 160 N. W. 2d 680 (1968), certiorari denied, 393 U. S. 102, 89 S. Ct. 904, 21 L. ed. 2d 796 (1969), but the prejudice here is compounded by the fact defendant was only 17 years of age, and under our law juvenile offenses are not crimes which can be used for impeachment.

Equally prejudicial was the unwarranted disclosure to the jury of defendant's narcotic addiction. In the course of cross-examining defendant about the presence of one Louis Smith in defendant's apartment, the following colloquy occurred:

"Q. Louis said he shot L.S.D. when he got up there.
"A. I don't know what Louis does. I never shot no L.S.D.
"Q. Never shot any L.S.D.?
"A. No."

Again, over strenuous objection, the prosecutor was permitted to examine defendant in great detail concerning his prior use

of drugs. The state attempts to justify the cross-examination because of defendant's volunteered answer, "I never shot no L.S.D." In State v. Flowers, 262 Minn. 164, 114 N. W. 2d 78 (1962), we held it reversible error to allow an attack on defendant's character where precisely the same kind of a volunteered unresponsive answer was given. In State v. Sharich, 297 Minn. 19, 209 N. W. 2d 907 (1973), we reaffirmed the rule that a general denial by defendant that he did a particular act is insufficient to put his character in issue. The state, on the other hand, relies on State v. Fulford, 290 Minn. 236, 187 N. W. 2d 270 (1971). There, however, we simply approved a cross-examination which expanded on defendant's direct examination in which he admitted he "reasoned" with a person from whom he sought money. The state was permitted on cross-examination to ask if in fact he didn't use a knife to coerce her. That cross-examination related to a single episode described by the defendant on direct. In the instant case, defendant's drug addiction had no relationship to the subject of the examination and his unresponsive answer, as we said in the Flowers case, was simply "the use of colorful and emphatic language common to persons of his background." 262 Minn. 170, 114 N. W. 2d 82. Under the circumstances of this case, there was no justification for seizing on an isolated statement to impeach defendant's character.

■ After the jury had been out a little over 24 hours, they reported they were deadlocked. Counsel for defendant asked the court if it intended to set a time for giving "a dynamite instruction," adding, "Not that I am in favor of it * * *." The following day, after the jury had been out about 50 hours, the court did give such a charge in the following language:

"THE COURT: Previously you asked to see me, and this time I asked to see you. Ladies and gentlemen of the jury, at this time I don't want to inquire into the status of your thinking. I realize that you have been up until now unable to reach a conclusion, and that's all that I know or need to know, and I don't want to ask any questions. It would be improper of me to do it.

"But I do want to urge you with all the seriousness of which I am capable to attempt to come to a conclusion in this case or these cases, if you will. I am sure you appreciate that the jury room is no place for any pride of opinion or for taking a position and sticking to it or for espousing and maintaining in the spirit of controversy either side of a position. The single object and the sole purpose to be effected in the jury room is, of course, to arrive at a true verdict and this can only be done—I am sure you are coming to realize that—can only be done by serious deliberations, exchange of ideas, and sentiments, mutual concessions, and a due deference to the opinions of each other.

"You should consider that this case must at some time be decided, and that you have been selected in the same manner and from the same source from which any future jury will be selected. And there is certainly no reason to suppose that this case will ever be submitted or be capable of being submitted to 12 men and women more intelligent, more impartial, or more competent to decide it than you are, nor can we assume that more or clearer evidence will somehow or other be presented at a later date on either one side or the other.

"Now, though the verdict to which any individual juror agrees must, of course, be his or her own verdict, and the result of his or her own convictions, there shouldn't be a mere agreement in the conclusions that his or her fellow jurors have reached; yet in order to bring 12 minds to a unanimous result, this is not easy, I am sure we all recognize that, to get 12 people to agree on anything. In order to bring 12 minds to a unanimous result on any question, you must examine the questions that have been submitted to you with candor and with a proper regard and deference to the opinions of each other. Though no juror is required to sacrifice conscientious convictions of his or her own, the fact that a juror finds his or her judgment opposed to the judgment of a great majority or a large number of the jury ought to induce that particular juror, as a reasonable person, so far to doubt the correctness of his or her own views as to weigh carefully the

opinions of his associates or her associates and the arguments and reasons upon which they are founded, and if upon due consideration that juror becomes convinced that others are probably right, and that he or she is in error, then it might become a duty to agree with those others.

"You should consider the time, the labor and the expense of this trial, and the time and labor and expense which another trial would no doubt entail. It is, therefore, your duty and I speak to you in all seriousness, and I am sure no one realizes it more than you do, to make all reasonable efforts which each and every one of you can conscientiously do to reach an agreement.

"Nothing I have had to say should be taken by you or any of you as somehow or other reflecting on your deliberations up until now. I have nothing but admiration for the serious approach which you are taking to your very, very serious job. Now, therefore, I ask you to retire again to the jury room and I ask all of you and I ask each and every one of you to make an earnest effort to reconcile your views, if you can conscientiously do so. You will now go back to the jury room and I know you will keep in mind what I have had to say."

Two hours and 20 minutes later, the jury found defendant guilty on one count and not guilty on another, which defendant argues, with some validity, suggests a compromise induced by the so-called "dynamite charge." Although the record is not clear, apparently counsel was present when the charge was given and made no further objection other than the statement of disapproval to which we have alluded. Nevertheless, we regard the question as one so basic and the rights involved so fundamental that we deem it proper to consider the matter on appeal.

The Allen charge had its origin in Commonwealth v. Tuey, 62 Mass. (8 Cush.) 1 (1851). The charge in the Tuey case was as follows:

"The only mode, provided by our constitution and laws for deciding questions of fact in criminal cases, is by the verdict of a

jury. In a large proportion of cases, and perhaps, strictly speaking, in all cases, absolute certainty cannot be attained or expected. Although the verdict to which a juror agrees must of course be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusion of his fellows, yet, in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided; that you are selected in the same manner, and from the same source, from which any future jury must be; and there is no reason to suppose that the case will ever be submitted to twelve men more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And with this view, it is your duty to decide the case, if you can conscientiously do so. In order to make a decision more practicable, the law imposes the burden of proof on one party or the other, in all cases. In the present case, the burden of proof is upon the commonwealth to establish every part of it, beyond a reasonable doubt; and if, in any part of it, you are left in doubt, the defendant is entitled to the benefit of the doubt, and must be acquitted. But, in conferring together, you ought to pay proper respect to each other's opinions, and listen, with a disposition to be convinced, to each other's arguments. And, on the one hand, if much the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his own mind is a reasonable one, which makes no impression upon the minds of so many men, equally honest, equally intelligent with himself, and who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath. And, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves, whether they may not reasonably, and ought not to doubt the correctness of a judgment, which is not concurred in by most of those with whom they are associated; and distrust

the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows." 62 Mass. (8 Cush.) 2.

In Allen v. United States, 164 U. S. 492, 17 S. Ct. 154, 41 L. ed. 528 (1896), the Supreme Court of the United States held that it was not error in a Federal prosecution to give the substance of the charge, which it noted was taken literally from that approved in the Tuey case. Until recently, appellate courts almost without exception have approved the use of the charge. However, any substantial departure from the Allen charge has led to appellate review and frequent reversals.

In this state we approved the charge in State v. Friend, 154 Minn. 428, 191 N. W. 926 (1923). A charge by the trial court including the statement, unchallenged by counsel, that "the case must be decided at some time," was held not to be grounds for reversal in State v. Siebke, 216 Minn. 181, 190, 12 N. W. 2d 186, 191 (1943). In State v. Doan, 225 Minn. 193, 205, 30 N. W. 2d 539, 546 (1947), we found nothing objectionable in the court's suggesting that jurors who were in the minority reconsider and review the testimony without a similar obligation being imposed on the majority. More recently, in State v. Holscher, 261 Minn. 478, 113 N. W. 2d 94, certiorari denied, 370 U. S. 955, 82 S. Ct. 1607, 8 L. ed. 2d 821 (1962); and in State v. Dickson, 297 Minn. 486, 209 N. W. 2d 785 (1973), we found no occasion to reconsider the validity of the Allen charge.

Briefly summarized, the principal criticism of the Allen charge centers on these considerations: First, the language is essentially coercive and there is no place in the jury system for the court's intruding and urging unanimity. Second, the Allen charge has resulted in a multitude of variations which have in turn bred and proliferated appellate review. Third, the charge emphasizes the obligation of the minority to consider whether or not its doubts are reasonable without imposing the same obligation on the majority. Fourth, it states that the case must, at some time, be decided which, in fact, is not and never has been the law. Fifth, by admonishing that absolute certainty cannot be attained

or expected, the Allen charge tends to erode the universal rule requiring guilt to be proved beyond a reasonable doubt. Sixth, and finally, in giving the Allen charge as a supplemental instruction, there is no uniformity among courts as to the length of time which must elapse after the jury retires before the charge is appropriate. This, in itself, has led to frequent appeals.

Turning to the language of the supplementary charge given in the instant case, there were two instructions which we now hold are no longer permissible. The first was as follows: "You should consider that this case must at some time be decided * * *." This is the precise language used in the Tuey charge and referred to with apparent approval in State v. Siebke, 216 Minn. 181, 190, 12 N. W. 2d 186, 191 (1943). A close analysis of the instruction convinces us that it has no support in any legal principle. The case for abandoning it was well stated by Judge Brown in what has become a landmark dissent. Huffman v. United States, 297 F. 2d 754, 755 (5 Cir. 1962). Judge Brown observed that it is simply not correct to state that a case must at some time be decided.

"* * * [F]ailure to agree at this trial is, at least momentarily, a victory for the defense and a legitimate end of the trial." 297 F. 2d 758.

The result is equivalent to a Scotch verdict of "not proven." As Judge Brown points out, when a jury is unable to agree, its deadlock constitutes in effect a declaration that as a body it is unable to find beyond a reasonable doubt that the defendant is guilty. The dissent goes on to say that the judge's failure to indicate which of two decisions must be reached does not make the "dynamite charge" any the less an intrusion into the exclusive domain of the jury, and concludes with the observation that "a mistrial from a hung jury is a safeguard to liberty."

A supplemental charge by a Federal trial court stating, "You have got to reach a decision in this case" was held coercive by the United States Supreme Court and grounds for reversal in

Jenkins v. United States, 380 U. S. 445, 85 S. Ct. 1059, 13 L. ed. 2d 957 (1965). As a logical extension of that decision, there is no doctrine which requires a case to be decided "at some time" since, presumably, it would be error for any judge in any subsequent case to direct the jury to reach a decision.

In a well-considered decision of the Alaska Supreme Court, Fields v. State, 487 P. 2d 831, 837 (Alaska, 1971), it was held that an unguarded admonition of the trial court that the jury was to deliberate until it reached a unanimous verdict was grounds for reversal. A requirement that the trial end with either a verdict of guilty or not guilty is not the law, the court stated, concluding that—

"* * * A hung jury is a legitimate end of a criminal trial, and is the occasionally inevitable result of requiring a unanimous verdict beyond a reasonable doubt." [1]

Two Federal cases deserve comment. The United States Court of Appeals for the District of Columbia in United States v. Thomas, 146 App. D. C. 101, 104, 449 F. 2d 1177, 1180 (1971), took note of the crowded criminal calendars in passing on the propriety of the court's statement to the jury—made subsequent to the giving of an Allen charge—that he was "not going to declare a mistrial, and thereby require a retrial of this case before some other jury." The court held (146 App. D. C. 108, 449 F. 2d 1184):

"* * * [W]hile there is need to expedite the work of the courts, this cannot be at the expense of the call of conscience. Indeed, it may well be that a hung jury might lead the prosecutor

---

[1] One commentator, citing Kalven & Zeisel, The American Jury, states: "* * * It is reliably estimated that only five per cent of criminal jury trials end in a failure to reach a verdict. Moreover, though reliable statistics are hard to come by, one study shows that on a nationwide average only about fifteen percent of felony prosecutions are ever tried to a jury. Thus on the basis of these two figures, it appears that approximately six-tenths of one per cent of all felony prosecutions end in hung juries." Note, 53 Va. L. Rev. 123, 145.

to reconsider whether the case, particularly a close or weak case, should be presented again to a jury—so that a mistrial need not necessarily 'require' a retrial, as the trial judge told the jurors. We have no doubt whatever that the judge acted out of the best of motives, and that any coercion of the jury was entirely unintended. The events transpiring, however, invoke our responsibility to appraise the activities complained of, not by the good intentions behind them, but in terms of their probable impact upon the jury. All circumstances considered, we think those activities strayed beyond legitimate bounds, with a substantial probability of prejudice to the accused, and with the result that the judgment of appellant's conviction cannot stand."

A similar result was reached in United States v. Flannery, 451 F. 2d 880, 883 (1 Cir. 1971), where the United States Court of Appeals held that while the court could properly instruct that it is desirable for the case to be decided, "we expressly disapprove the *Tuey* statement that 'the case must at some time be decided.' * * * A jury, any number of juries, have a right to fail to agree." [2]

We are in accord with the views expressed in the cases cited and find no basis in the law for holding that a criminal case must be retried until a verdict is reached. As other courts have suggested, after there have been one or more hung juries in a criminal case, prosecutors very frequently decline to relitigate it. This is particularly so where there is no new evidence and no reason to believe that the case was not fully and fairly presented on both sides. Under Minnesota law, whether a defendant is guilty or innocent, he may not be convicted unless a unanimous jury finds proof beyond a reasonable doubt that he is guilty. Accordingly,

---

[2] The United States Court of Appeals in Green v. United States, 309 F. 2d 852, 856 (5 Cir. 1962), recognizes the right of an accused to a hung jury and a mistrial, and the Oregon Supreme Court in State v. Marsh, 260 Ore. 416, 442, 490 P. 2d 491, 503, observes that the possibility of a hung jury is "part and parcel of our jury system."

we now hold that it is error to charge the jury that a case must at some time be decided.

An instruction which finds support in the Allen-Tuey charge but which we now believe to be incompatible with a sound approach to the process of guiding jury deliberations was given by the trial court in the following language:

"* * * Though no juror is required to sacrifice conscientious convictions of his or her own, the fact that a juror finds his or her judgment opposed to the judgment of a great majority or a large number of the jury ought to induce that particular juror, as a reasonable person, so far to doubt the correctness of his or her own views as to weigh carefully the opinions of his associates or her associates and the arguments and reasons upon which they are founded, and if upon due consideration that juror becomes convinced that others are probably right, and that he or she is in error, then it might become a duty to agree with those others."

Again, most of the courts which have had occasion to reexamine the Allen charge in recent years have disapproved an instruction which admonishes the minority to reconsider and reevaluate its position without imposing a similar obligation on the majority. The Supreme Court of Montana in State v. Randall, 137 Mont. 534, 542, 353 P. 2d 1054, 1058 (1960), reversed a conviction where a similar charge was given, and expressed a view with which we are in agreement:

"The inevitable effect of the instruction would be to suggest to the minority members of the jury that they ought to surrender their own convictions and follow the majority. A vibrant, pulsating, intelligent minority is a part of our American way of life. The views of the minority often, with the passage of time, become the majority view as evidenced by the Arizona cases, supra. The majority view on any given subject is not always the correct view."

The United States Court of Appeals in Green v. United States, 309 F. 2d 852 (5 Cir. 1962), was dealing with a variation of the

Allen charge which, to be sure, was far less balanced than the charge given in the instant case. The trial court in effect stated (309 F. 2d 853) that the minority should listen to the majority since the majority "will have better judgment than the mere minority"—a "fact" which the trial court believed should cause the minority to question the correctness of its position. Nevertheless, in holding the charge to be coercive, the court of appeals felt there was small, if any, justification for using the Allen charge, and had this to say concerning majorities (309 F. 2d 855):

"* * * Mark Twain may have been exaggerating it when he said, 'Whenever you find that you are on the side of the majority, it is time to reform,' but there is no legal rule that the majority of jurors have better judgment than the minority. There is no legal rule that the minority, merely because they are in the minority, should distrust their own judgment. Such an instruction leads a jury to believe that it is the duty of the dissenting jurors to accede to the majority's views without full discussion and without regard to the historical right of a single juror to stick to his conscientious opinions of the case."

In a similar vein, the Third Circuit Court of Appeals made a case for the minority with considerable eloquence in United States v. Fioravanti, 412 F. 2d 407, 416 (3 Cir. 1969), certiorari denied sub nom. Panaccione v. United States, 396 U. S. 837, 90 S. Ct. 97, 24 L. ed. 2d 88 (1969):

"It is also suggested that the Allen Charge is justifiable because it encourages the minority to consider the viewpoint of the majority; that this invitation to see the other man's point of view will discourage stubbornness, narrowmindedness, and contrariness on the part of a few who would otherwise unnecessarily retard the workings of justice.

\* \* \* \* \*

"Thus is revealed the very real treachery of the Allen Charge. It contains no admonition that the majority reexamine its posi-

tion; it cautions only the minority to see the error of its ways. It departs from the sole legitimate purpose of a jury to bring back a verdict based on the law and the evidence received in open court, and substitutes therefore a direction that they be influenced by some sort of Gallup Poll conducted in the deliberation room."

We concur in the views expressed that risking a coercive verdict by applying pressure on a minority of the jurors in order to terminate litigation is not the solution to calendar congestion. Hung juries are not a serious problem in either civil or criminal cases, and the potential for coercion by the intrusion of the court into the functions of the jury is too dear a price to pay for relieving court congestion.

Virtually all of the objectionable features of the Allen charge have been eliminated by the procedures proposed in A. B. A. Standards Relating to Trial by Jury, § 5.4 (Approved Draft, 1968). That section provides:

"5.4 Length of deliberations; deadlocked jury.

"(a)   Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(i)   that in order to return a verdict, each juror must agree thereto;

(ii)   that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(iii)   that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(iv)   that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(v)   that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

"(b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals.

"(c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement."

A number of courts have now abandoned the Allen charge and adopted the A. B. A. Standards. United States v. Brown, 411 F. 2d 930 (7 Cir. 1969); Fields v. State, 487 P. 2d 831, 840 (Alaska, 1971); United States v. Thomas, 146 App. D. C. 101, 449 F. 2d 1177 (1971); State v. Marsh, 260 Ore. 416, 490 P. 2d 491 (1971); State v. White, 285 A. 2d 832 (Maine, 1972).[3] One court has abandoned the Allen charge and recommended the A. B. A. Standards. Commonwealth v. Spencer, 442 Pa. 328, 275 A. 2d 299 (1971). One other has tacitly approved the standards without abandoning the Allen charge, State v. Ferguson, 84 S. D. 605, 175 N. W. 2d 57 (1970); and State v. Champagne, 198 N. W. 2d 218 (N. D. 1972), has recommended the standards. The following courts have abandoned the Allen charge without adopting the standards: State v. Smith, 108 Ariz. 121, 124, 493 P. 2d 904, 907 (1972); State v. Randall, 137 Mont. 534, 353 P. 2d 1054 (1960); United States v. Fioravanti, 412 F. 2d 407, 414 (3 Cir. 1969); Azbill v. State, 88 Nev. 240, 248, 495 P. 2d 1064, 1069 (1972). One court has recently approved the Allen charge. United States v. Hynes, 424 F. 2d 754 (2 Cir. 1970).

We now hold that use of the Allen charge shall be discontinued in Minnesota and the procedures set forth in A. B. A. Standards Relating to Trial by Jury, § 5.4, are adopted for the trial courts in this state. The advantages of the Standards are these: The jury is forewarned of how it should proceed to forestall a dead-

---

[3] See, Note, 56 Minn. L. Rev. 1199; and 47 N. Y. U. L. Rev. 296, 310, for excellent discussions and analyses of the A. B. A. proposals.

lock before there is a minority or a majority. The potential for coercion is minimized if the charge is simply reread at a time when the jury appears to be deadlocked. It avoids the undesirable effect on the minority of having the prestige of the court brought to bear on it by the court's focusing only on the minority to achieve unanimity. The timing of the supplementary instruction is less critical since the charge has already been given when the jury retires.

Rather than stressing the duty to decide the case, the jurors are admonished only to consult and deliberate with a view to reaching an agreement consistent with their individual judgments. The emphasis is on further consideration of the evidence by all the jurors, and any juror, whether in the minority or majority, is invited to reexamine his views and change his opinion if he is convinced it is in error. But the thrust of the proposed charge is a positive one that no juror should surrender his honest conviction simply because of his fellow jurors' opinion or just to reach a verdict. Finally, and most important, the standards omit any suggestion that if that jury does not decide the case, necessarily some other jury will have to discharge the responsibility which the first jury failed to fulfill.

Reversed and remanded for a new trial.

MR. JUSTICE YETKA and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.