**UNITED STATES, Appellee,**

v.

**Victor VEGA–ENCARNACION, Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Hector Orlando CRUZ–ROSARIO, Defendant, Appellant.**

**Nos. 89–2137, 89–2138.**

United States Court of Appeals, First Circuit.

Heard Aug. 1, 1990.

Decided Sept. 12, 1990.

21

Francisco M. Dolz–Sanchez, San Juan, P.R., for defendant-appellant Victor Vega–Encarnacion.

Olga M. Shepard, Hato Rey, P.R., for defendant-appellant Hector Orlando Cruz–Rosario.

Edwin O. Vazquez, Asst. U.S. Atty., with whom Daniel F. Lopez–Romo, U.S. Atty., was on brief, for appellee.

Before CAMPBELL and SELYA, Circuit Judges, and BOWNES, Senior Circuit Judge.

BOWNES, Senior Circuit Judge.

Defendants-appellants Victor Vega–Encarnacion and Hector Orlando Cruz–Rosario appeal their jury convictions of aiding and abetting each other in the distribution of more than 5,000 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. A third co-defendant, Roberto Vazquez–Carrera, pled guilty prior to trial.[1]

The issues are essentially the same for both appellants: (1) was the evidence sufficient to support the convictions; (2) did the district court correctly apply the sentencing guidelines; and (3) did the district court impose unduly harsh sentences in retaliation for the defendants' invoking their right to stand trial. We affirm the convictions and the sentences.

## SUFFICIENCY OF THE EVIDENCE

■ We recap the evidence as to both defendants keeping in mind that it bears on the sentences given them, as well as on the issue of whether it sufficed to sustain the convictions. Our review of the evidence is

---

1. Vazquez–Carrera also pled guilty to a second count in the indictment, carrying a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). Defendant Cruz–Rosario also was charged with this offense, but it was dismissed by the district court during trial.

made "in the light most favorable to the government, drawing all legitimate inferences and resolving all credibility determinations in favor of the verdict." *United States v. Angiulo*, 897 F.2d 1169, 1197 (1st Cir.1990).

The case started with an investigation by Puerto Rico police officers and DEA agents aimed at the suspected drug activities of Vazquez–Carrera, Cruz–Rosario and Vega–Encarnacion. The government's case was based on the testimony of Miguel Andaluz Baez, who was the only live witness at the trial. Andaluz was a member of the Drugs and Narcotics Division of the Puerto Rico Police Department. He was assigned to the special section of the United States Drug Enforcement Administration and acted as undercover agent in the investigation.

Officer Andaluz made five telephone calls to Vazquez–Carrera in which he played the role of a drug buyer. The purpose of the telephone calls was to arrange a drug sale. All of the telephone calls were recorded. It was stipulated by defendants that the tapes of the telephone calls were accurate recordings of the phone conversations. In addition to the voices of Officer Andaluz and Vazquez–Carrera, the recordings also included statements by a government informant, referred to as Tony. Vazquez–Carrera went by the name of Tito. Andaluz's alias was Mickey. All of the tape-recorded phone conversations were played to the jury. We have not been furnished with either the tape recordings or transcripts of them and assume that neither of the defendants is implicated directly by the phone conversations.

After three phone calls, Officer Andaluz succeeded in arranging for the purchase of five kilos of cocaine for $70,000. The "buy" was to take place on April 21, 1989 at the Plazoleta de Isla Verde. Andaluz called Vazquez–Carrera and informed him that he was at the Plazoleta with the money for the cocaine. Vazquez–Carrera said that he would be there in about an hour. When Vazquez–Carrera did not show up, Andaluz decided to call him again. As he started to make the call, Andaluz saw defendant Cruz–Rosario driving past in a green Honda accompanied by another individual. The phone call was made. Vazquez–Carrera assured Andaluz that he would be there shortly. After another fruitless wait, Andaluz called Vazquez–Carrera again. Vazquez–Carrera told Andaluz that he was in the Isla Verde area, but that the person who had the apartment where the cocaine was stored was away, and he could not get into the apartment. Vazquez–Carrero asked Andaluz to wait a little longer. Andaluz made one more phone call to Vazquez–Carrera and told him he was not going to wait all night. He suggested that Vazquez–Carrera meet him without the cocaine so they could discuss how to carry out the deal later. Vazquez–Carrera did not meet with Andaluz, but defendant Cruz–Rosario did.

Cruz–Rosario came to the agreed-upon meeting place accompanied by a black man, who was not identified. Andaluz asked Cruz–Rosario if he was there on behalf of Tito (Vazquez–Carrera), and Cruz–Rosario said he was. Cruz–Rosario explained that the person who had the keys to the apartment where the cocaine was stored had gone to Fajardo and Vazquez–Carrera did not know when he would return. Andaluz told Cruz–Rosario to tell Vazquez–Carrera that he would get in touch with him on Monday morning about the sale of the five kilos of cocaine, and that he was not going to wait around all night.

Andaluz called Vazquez–Carrera on Monday morning, April 24, and the conversation was recorded. It was agreed that the sale of cocaine would take place that afternoon. Another call was made by Andaluz on Monday afternoon in which he alerted Vazquez–Carrera that he was on his way to the meeting place. An operational plan was then put into effect which culminated with the arrest of Vazquez–Carrera and the defendants. The plan involved Andaluz, the informant, DEA Agent Joseph Figueroa, who had recorded the telephone calls, and a surveillance group of at least five other law enforcement officers.

Andaluz and the informant drove to the Laguna Gardens Shopping Center, the site chosen for the transaction, in the infor-

mant's car. Andaluz then called Vazquez–Carrera, who said he would meet Andaluz in about fifteen minutes. Andaluz and the informant leaned against the rear of the informant's car. Agent Figueroa kept Andaluz in sight at a prudent distance away. Andaluz noticed the same green Honda that he had seen at the aborted meeting drive into the shopping center parking lot. As before, it was driven by Cruz–Rosario; also in the car was Vazquez–Carrera. They got out of the car and greeted Andaluz and the informant. It was agreed that Vazquez–Carrera would go with the informant in the informant's car and pick up the cocaine. Andaluz would stay at the meeting place with Cruz–Rosario until Vazquez–Carrera and the informant returned with the five kilos of cocaine.

Andaluz and Cruz–Rosario chatted together while they waited for the cocaine. During the chit-chat, Cruz–Rosario pointed out to Andaluz a person standing near the green Honda. He said that the individual looked like a policeman and that if he approached while the drug deal was taking place, he (Cruz–Rosario) would shoot him four times. He and Andaluz would then flee the scene in his car. Cruz–Rosario also asked Andaluz if he knew anyone who was interested in buying marijuana. Cruz–Rosario told Andaluz that Vazquez–Carrera had gone to pick up the cocaine at the Mar de Isla Verde Condominium.

The informant and Vazquez Carrera then returned to the parking lot in the informant's car. Following them was a champagne-colored Mitsubishi driven by defendant Vega–Encarnacion. The informant's car proceeded to a parking lot at the rear of the shopping center. Andaluz saw the informant and Vazquez–Carrera walking along a passageway between the two parking lots. He and Cruz–Rosario went to meet them. The informant said everything was okay and Vazquez–Carrera told Andaluz that the five kilos of cocaine were in the informant's car, and Andaluz should go to the car and check it out.

As Andaluz proceeded towards the car, he noticed Vega–Encarnacion, who had been seated on the sidewalk next to the parking lot, get up and follow him. Andaluz stopped and asked Vega–Encarnacion "if he was together with Tito" (Vazquez–Carrera). Vega–Encarnacion replied that he was. Andaluz told him that he was going to look at the cocaine. Vega–Encarnacion said the five kilos were in the back seat of the car. Andaluz went to the car, opened the door and found a carton in the back seat containing five kilos of cocaine. When Andaluz arrived at the car, it was unlocked and the keys were in the ignition. Andaluz told Vega–Encarnacion to lock the passenger door of the car. Andaluz removed the keys from the ignition and locked the driver's door. As Andaluz and Vega–Encarnacion walked back to the meeting place, Vega–Encarnacion told him that he had come to do the business himself because Tito (Vazquez–Carrera) did not know how to do the deal. Vega–Encarnacion also told Andaluz that any future deal would be carried out in a different manner. Andaluz asked Vega–Encarnacion if the cocaine belonged to him, and Vega–Encarnacion replied that it did.

Andaluz then asked Vega–Encarnacion to come with him to the other parking lot to get the money to be paid for the cocaine. As they walked towards the informant and Vazquez–Carrera, Andaluz gave a prearranged signal to the surveillance team—he combed his hair backwards. He then told Vazquez–Carrera and Vega–Encarnacion to wait for him while he got the money. He and Agent Figueroa then went to Figueroa's car, opened the trunk, removed the money from a clothing bag and replaced it with old papers, which were in the trunk. With the bag in his hand, Andaluz, accompanied by Figueroa, went back to where the informant, Vazquez–Carrera and Vega–Encarnacion were waiting. He told them to come with him to the rear parking lot. When they got to the rear parking lot, Andaluz saw the car with the surveillance team. He gave the prearranged signal again. The special agents got out of the car, told the group they were under arrest and ordered them to lie on the ground. Vega–Encarnacion looked as if he was going to try and flee, but Andaluz, who was

lying on the ground, persuaded him not to do so.

Following the arrest, Andaluz was placed in a car with defendant Cruz–Rosario. The Miranda warnings were given. After they arrived at the DEA offices and Andaluz's handcuffs were removed, he and Agent Figueroa identified themselves as police officers to Cruz–Rosario. Andaluz asked Cruz–Rosario if he wanted to cooperate or wanted an attorney. Cruz–Rosario said that he did not want an attorney, that he only wanted to cooperate. Cruz–Rosario told Andaluz and Figueroa that Vazquez–Carrera always went to the Mar de Isla Verde Condominium to get the cocaine he sold but that he did not know in which apartment the cocaine was kept.

We have no problem holding that this evidence was more than sufficient to sustain the convictions of the defendants. We affirm the district court's denial of the motions by each defendant for an acquittal pursuant to Fed.R.Crim.P. 29(a).

### THE GUIDELINES SENTENCES

■ Before discussing the individual sentences, some general observations are in order. Neither defendant has challenged the accuracy of the pre-sentence report, only the conclusions to be drawn therefrom. We have held that the application of the Sentencing Guidelines to the factual record will be overruled only if the trial court's determination is clearly erroneous. *United States v. Fuentes–Moreno,* 895 F.2d 24, 26 (1st Cir.1990); *United States v. Diaz–Villafane,* 874 F.2d 43, 48 (1st Cir.1989); *United States v. Wright,* 873 F.2d 437, 443–44 (1st Cir.1989). The Supreme Court has held that " '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1984) (quoting *United States v. United States Gypsum*

*Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1985)). We now turn to the individual sentences.

### *Defendant Vega–Encarnacion*

■ The court determined the base offense level to be 30. This was based on the amount of drugs involved: 4,366 grams, total net weight.[2] The court found that defendant's role in the criminal activity was as an organizer, leader or supervisor of less than five participants. This increased the offense level by two. There was no deduction for acceptance of responsibility. The total offense level was, therefore, 32. Defendant had a criminal history category of I. The guideline imprisonment range was from 121 to 151 months, plus a supervised release term of four years.

In determining defendant's sentence, the court found that the amount of drugs involved lay within the upper limit of the applicable drug range allowed for the offense level. The court also found that the unusually high purity of the drug seized suggested that the defendant held a prominent role in the drug trafficking scheme, and had close proximity to the drug source.

Defendant was sentenced to 150 months imprisonment. He strenuously objects to the guideline computation, contending that he was not an organizer, leader, manager or supervisor of the criminal activity. Defendant asserts that he was either a minimal, or at worst, a minor participant in the crime and therefore was entitled to either a four-point or two-point reduction in the offense level. He argues that Vazquez–Carrera was the principal director of the attempted sale of the five kilos of cocaine, and he was only an accessory. Defendant, however, cannot erase his statement to Officer Andaluz while the crime was in process that he was there "to do the business himself" because Vazquez–Carrera "did not know how to do the deal." Nor can we ignore defendant's affirmative response when Andaluz asked him if the cocaine belonged to him. Defendant argues that

---

**2.** The amount charged in the indictment was 5,266 grams, gross weight. The trial stipulation entered into evidence stated the weight as 4,366 grams. The district court ruled, contrary to the PSR, that the stipulation weight controlled.

these statements were mere bragging, not factual assertions. We have no way of knowing whether this is so. But we do know and hold that the district court had ample grounds for its finding that defendant's role in the crime was that of organizer, leader or supervisor.

*Defendant Cruz–Rosario*

■ For the same reasons as in the case of Vega–Encarnacion, the court found the base offense level to be 30. There was, of course, no acceptance of responsibility for the crime. The court found defendant to be a minor participant. This reduced the offense level to 28. Based on this offense level and a criminal history category of I, the guideline imprisonment range is from 78 to 97 months, plus a supervised release term of four years. Defendant was sentenced to 84 months.

Defendant argues on appeal that he should have been found to be a minimal participant, which would have reduced the offense level from 30 to 26.

There is a thin line between a minor and minimal participant, and at times, it is difficult to determine just where to draw it. There was ample justification for the court's determination that defendant's role in the crime was that of a minor participant. The finding was certainly not clearly erroneous.

## THE ALLEGED RETALIATORY SENTENCING

■ In sentencing Vazquez–Carrera, who had pled guilty prior to trial, the district court departed downward from the guidelines because Vazquez–Carrera had given substantial assistance to the United States. Such a departure is specifically authorized by § 5K1.1 of the Guidelines which provides in pertinent part: "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." Vazquez–Carrera was sen-

tenced to 30 months on each of the two counts to which he pled,[3] to be served consecutively.

Both defendants argue that their sentences, which were greater than that given to Vazquez–Carrera, were imposed in retaliation for their choosing to stand trial instead of pleading guilty. The decisive answer to this contention is that we have no appellate jurisdiction to consider a sentence that was within the applicable guideline range and was correctly determined, as were the sentences in this case.

18 U.S.C. § 3742(a) states the bases for appeal by a defendant of the sentence imposed by the district court:

(a) **Appeal by a defendant.**—A defendant may file a notice of appeal in the district court for review of an otherwise final sentence if the sentence—

(1) was imposed in violation of law;

(2) was imposed as a result of an incorrect application of the sentencing guidelines; or

(3) is greater than the sentence specified in the applicable guideline range to the extent that the sentence includes a greater fine or term of imprisonment, probation, or supervised release than the maximum established in the guideline range, or includes a more limiting condition of probation or supervised release under section 3563(b)(6) or (b)(11) than the maximum established in the guideline range; or

(4) was imposed for an offense for which there is no sentencing guideline and is plainly unreasonable.

The defendants' sentences do not meet any of the appeal provisions of the statute.

In *United States v. Tucker*, 892 F.2d 8 (1st Cir.1989), we reviewed the legislative history of the statute and found that "Congress did not intend to allow an appeal from a sentence within the Guidelines." *Id.* at 11. *See also United States v. Jiminez–Otero*, 898 F.2d 813, 815 (1st Cir.1990);

---

**3.** Count One: aiding and abetting in the distribution of more than 5,000 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count Two: carrying of firearm during a drug trafficking crime, in violation of 18 U.S.C. § 984(c)(1).

*United States v. Pighetti,* 898 F.2d 3, 4 (1st Cir.1990).

*Affirmed.*