**UNITED STATES, Appellee,**

v.

**Paul Edward AUBIN, Defendant, Appellant.**

**No. 91–1870.**

United States Court of Appeals, First Circuit.

Heard Feb. 7, 1992.

Decided April 15, 1992.

Stephen E. Cicilline, Providence, R.I., for defendant, appellant.

Duane J. Deskins, Asst. U.S. Atty. with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief for appellee.

Before TORRUELLA, Circuit Judge, ALDRICH and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

Defendant-appellant Paul Aubin was tried and convicted by a jury of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d). Defendant appeals. There are four issues: (1) whether the identification evidence was sufficient to uphold the verdict; (2) whether the district court erred in refusing to answer questions from the jury; (3) whether the district court erred in refusing to instruct the jury that it had a right to have testimony read back to it; and (4) whether the district court erred in sentencing the defendant. For the reasons that follow, we affirm.

## THE ROBBERY

A few minutes before midnight on September 1, 1989, a computer sensor notified the main office of Baybank that there was a malfunction in its automatic teller machine (ATM) at Duxbury, Massachusetts. Robin Napolitan and William Sanford, Baybank employees, were dispatched from their homes to correct the problem. They arrived at the ATM a few minutes after midnight. Sanford inspected the ATM and found that someone had tampered with the money dispensing drawer. This was consistent with the computer analysis. They deactivated the alarm system, corrected the problem, reset the machine, notified the Baybank dispatcher, activated the alarm system, and started towards the parking lot.

As Napolitan and Sanford were walking away from the ATM, they were confronted by a man wearing a nylon stocking mask and holding a silver and chrome-plated revolver. He said: "This is a hold-up, don't move or do anything." The robber escorted Napolitan and Sanford back to the ATM. He then ordered them to deactivate the alarm to the ATM, which they did. After all three entered the ATM, the robber put the dead bolt to the door in place and ordered Sanford to deactivate the vault alarm. Sanford did as he was told. Sanford and Napolitan were then ordered to "put on" the complementary halves of the combination lock to the vault. This was done. Sanford and Napolitan were told to "stand against the wall." The robber then proceeded uninstructed, to release the unlabeled catch on the money dispenser drawer, which he withdrew and emptied into a duffle bag. He then, again uninstructed, located and opened the deposit drawer where the backup money supply was kept. This was emptied into the duffle bag. Napolitan was given duct tape by the robber and told to bind Sanford, which she did. The robber then bound Napolitan and left. He took with him the duffle bag containing $149,999, the handset from the ATM's wall

telephone, and the set of alarm keys from the ATM alarm box. Sanford was able to free himself and activate a police alarm. The police arrived a short time later.

## THE IDENTIFICATION EVIDENCE

■ Appellant claims that the identification evidence was not sufficient to sustain the guilty verdict. Our standard of review is clear. We "consider the evidence as a whole taken in the light most favorable to the Government, together with all legitimate inferences to be drawn therefrom to determine whether a rational trier of fact could have found guilt beyond a reasonable doubt." *United States v. Geer*, 923 F.2d 892, 894 (1st Cir.1991) (quoting *United States v. Smith*, 680 F.2d 255, 259 (1st Cir.1982)). We must determine whether "*any*" rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Questions of credibility are for the jury, and we must defer to its findings. *United States v. Garcia*, 905 F.2d 557, 560 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990).

We start our analysis by noting that Sanford, who was the principal identification witness, had plenty of opportunity to observe the robber and hear his voice. He was in the robber's immediate presence for about fifteen minutes in a well lighted area. On November 15, 1989, Sanford identified defendant from a six man line-up identification. Each man wore a stocking mask and spoke the words the robber used the night of the robbery. Defendant's lawyer was present and made no objections to the procedure followed.

At trial Sanford testified that the person he identified at the line-up positively was the robber. Sanford based his positive identification on the person's "height, his build, his voice and the way his features appeared underneath the nylon." Sanford's courtroom identification of the defendant was less positive. He was asked: "Are you positive that this person standing up in the courtroom today was [the one you picked out] in the line-up?" Sanford's answer was "No." At this time defendant was not wearing a stocking mask and did not speak.

On cross-examination of James Burleigh, the FBI agent who prepared the line-up, it was brought out that Sanford stated to Burleigh at the line-up that on a scale of one to ten his identification of defendant as the robber would be an eight. Despite being pressed hard on cross-examination, Sanford insisted that he was "positive" that the man he picked out of the line-up was the robber.

The identification of defendant as the robber rested on more than the testimony of Sanford. Baybank's ATM machine was manufactured and serviced by Diebold Inc. There was testimony by Dennis Durbin, manager of Diebold's customer response center as follows. Defendant had been employed by Diebold as a service technician from April 7th of 1986 through March 19, 1989. As a service technician, defendant received training in the operation of ATM alarms including activation and deactivation. He also had been trained regarding problems and malfunctions that might take place. The Diebold records showed that defendant, in the course of his employment, made service calls on Baybank ATMs. He had not, however, made any service calls on the ATM that was robbed; it was not in defendant's service area.

Based on the way the robbery was carried out, the jury had solid grounds for inferring that someone familiar with the operation of a Diebold ATM was the perpetrator. The identification testimony of Sanford was not flawless, but it was strengthened by defendant's work experience with Diebold.

We find that the identification issue was properly submitted to the jury. We add that there is no basis in the trial record for defendant's claim that there was deliberately false testimony by FBI Agent Burleigh relative to the line-up identification by Sanford.

## THE JURY QUESTIONS

After the case was submitted to the jury, it sent the following questions to the judge: "Did Sanford positively ID Paul Aubin with the mask? Was this eight out of ten unpositive ID only for the unmasked?"

The judge asked counsel: "How do you want me to answer." A lengthy discussion ensued. The prosecution asked to be allowed to reopen the evidence and clarify the issue for the jury. Defense counsel objected and the court sustained the objection. The court ruled that the issue was a factual one for the jury. It pointed out that reopening would be unfair and that clarity could only be achieved through asking impermissible leading questions. The judge then proposed the following answer to the jury: "Members of the jury: The Court cannot answer your questions. It is for you as fact finders to interpret the evidence, weigh it and evaluate it without further directions from the Court. Please proceed with your deliberations."

Both counsel objected and the judge requested alternative answers. Counsels' proffers were rejected, and the jury's questions were answered by the reply formulated by the judge.

We uphold the court's handling of this problem. The district court did not treat the jury questions lightly or casually. To the contrary, his conference with the lawyers consumed more than thirty pages of the trial transcript. We are satisfied that the court drew the correct distinction between evidence, inference, interpretation, and argument. The jury questions sought to resolve a conflict among the jurors as to what the testimony had been; such a conflict must be resolved by the trier of fact. "[T]he duty to resolve conflicts in testimony rests with the jury." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789.

## THE REFUSAL OF THE DISTRICT COURT TO INSTRUCT THE JURY THAT IT HAD THE RIGHT TO HAVE TESTIMONY READ BACK TO IT

Usually the question whether testimony should be read back arises when the jury explicitly requests the rereading. *See* e.g., *United States v. Akitoye*, 923 F.2d 221, 226 (1st Cir.1991); *United States v. Argentine*, 814 F.2d 783, 787 (1st Cir.1987); *United States v. George*, 752 F.2d 749, 757 (1st Cir.1985); *United States v. Hyson*, 721 F.2d 856, 865 (1st Cir.1983); *United States v. Pimental*, 645 F.2d 85, 87 (1st Cir.1981); *United States v. Almonte*, 594 F.2d 261, 265 (1st Cir.1979).

We have been unable to find a case, and defendant has cited none, holding that the trial court should instruct the jury that it has the right to have portions of the testimony reread to it. This is not surprising because while the jury may request a rereading of testimony, it does not have the right to a rereading. "[R]ereading testimony during jury deliberations rests in the presider's sound discretion." *Akitoye*, 923 F.2d at 226. *See also Argentine*, 814 F.2d at 787; *George*, 752 F.2d at 757; *Hyson*, 721 F.2d at 865; *Pimental*, 645 F.2d at 87; *Almonte*, 594 F.2d at 265. "In a nutshell, the judge must weigh the reasonableness of the request, the ease or difficulty in compliance, and what is likely to be gained or lost." *Akitoye*, 923 F.2d at 226.

We have upheld the refusal of the district court to reread testimony for a variety of reasons: (1) that the judge "consult[ed] with counsel at each step of the [process]," *Akitoye*, 923 F.2d at 226; (2) that the trial had been brief so that the testimony was fresh in the minds of the jurors, *id.; Hyson*, 721 F.2d at 865; (3) that there existed the risk of confusion and boredom if rereading was permitted, *Akitoye*, 923 F.2d at 226; (4) "that the requested testimony was too 'scattered,'" *George*, 752 F.2d at 757; (5) that the testimony should not be taken out of context, *Hyson*, 721 F.2d at 865; and (6) that "culling the testimony would, in effect, make the court a finder of fact." *Almonte*, 594 F.2d at 265.

Some of these reasons existed here. The attorneys were consulted at length at every step, the trial testimony had lasted only one day so it was fresh in the jurors' minds, the concern of out-of-context testimony was a salient issue in the court's

decision not to answer the jurors' questions, and it appeared that there would have been difficulty agreeing to the scope of what should be read back. Had the jury here asked for a portion of the testimony to be read back, the judge would have been within his discretion to refuse the request.

We hold that the judge's refusal to advise the jury that it could have the testimony reread was not error. We do not mean to suggest by this that it would be an abuse of discretion for a trial judge to instruct the jury that it could have testimony read back to it. That, too, would fall within the district court's discretion.

## THE SENTENCING

■ Defendant asserts that the district court erred in increasing his offense level by two because of the use of special skills in the commission of the crime. Section 3B1.3 of the United States Sentencing Guidelines states in pertinent part: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." In the application notes special skill is defined as follows: " 'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing."

Whether the defendant possessed a special skill that "significantly facilitated the commission ... of the offense" is a factual finding that is subject to the clearly erroneous standard of review. 18 U.S.C. § 3742(e); *United States v. Rehal,* 940 F.2d 1, 5 (1st Cir.1991); *United States v. Vega–Encarnacion,* 914 F.2d 20, 24 (1st Cir.1990). There can be little doubt that as a trained service repairman for Diebold ATMs defendant possessed special skills that facilitated the commission of the crime. There could have been no robbery unless defendant knew how to cause a malfunction that would bring ATM service people to the machine, thus enabling the defendant to enter the ATM. Once inside he used his special skill to see to it that the alarms were deactivated. Once this was done, defendant used his knowledge of Diebold ATMs to unerringly locate and obtain the money. Defendant's work on other Baybank ATMs gave him inside knowledge of when a large cash haul would be likely. The amended presentence report shows that in addition to defendant's training by Diebold he held a Rhode Island license as an Electrician Limited Journeyman and also held an alarm license from the Rhode Island Alarm Licensing Authority. Defendant's electrical skills had won him an award from the New England Institute of Technology for outstanding achievement and demonstration of exceptional potential in electrical technology.

Defendant was, by virtue of his training and experience, equipped with the special skill necessary to make him an expert robber of Diebold ATMs. The district court did not err in increasing his offense level by two.

■ The second sentencing issue raised by defendant can be quickly dispatched. Defendant claims that the district court erred by sentencing defendant to the maximum limit of 97 months under the applicable guideline. We have consistently held that we do not have jurisdiction to review a sentence within the applicable guideline. *See United States v. Vega–Encarnacion,* 914 F.2d at 25; *United States v. Jimenez–Otero,* 898 F.2d 813, 815 (1st Cir.1990); *United States v. Pighetti,* 898 F.2d 3, 4 (1st Cir.1990).

The judgment and sentence of the district court is Affirmed.