Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 10, 2004          Decided July 20, 2004

No. 02-3119

UNITED STATES OF AMERICA,
APPELLEE

v.

SHOLA AYENI,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 02cr00009–01)

———

*Peter S. Spivack*, appointed by the court, argued the cause for appellant. With him on the briefs was *Keith J. Benes*.

*Elizabeth H. Danello*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *John R. Fisher, Roy W. McLeese III*, and *Steven J. Durham*, Assistant U.S. Attorneys.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: RANDOLPH, TATEL, and GARLAND, *Circuit Judges.*

Opinion for the Court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* TATEL.

PER CURIAM: Convicted by a jury of committing and conspiring to commit fraud and theft from the Superior Court of the District of Columbia, appellant argues that the district court improperly allowed counsel to offer supplemental arguments in response to factual questions that the jury asked after commencing its deliberations. He also contends that the district court erred by refusing to declare a mistrial when a juror reported having had a brief contact with the government's star witness. Addressing only the first of these arguments, we conclude that the district court abused its discretion by permitting the supplemental arguments, and we therefore reverse the conviction and remand for a new trial.

## I.

Appellant Shola Ayeni, an attorney, served as appointed counsel for criminal defendants in the Superior Court of the District of Columbia. In 2002, a grand jury indicted him and one of his investigators, Troy Robinson, on charges of committing and conspiring to commit fraud and theft from programs receiving federal funds. According to the indictment, Ayeni and Robinson ran a scheme whereby Ayeni obtained nearly 2,000 of the vouchers that attorneys representing poor criminal defendants in the Superior Court provide to people required to testify in their clients' cases. Ayeni then gave the vouchers, each worth $40, to Robinson, who had friends and family members—not one of whom was a witness—redeem them and give the money (minus a commission) to him. He in turn gave the money to Ayeni. Robinson received nothing during these transactions; Ayeni allegedly promised to give him thousands of dollars worth of other vouchers later.

Ayeni's first trial ended in a hung jury. Before the re-trial, the government secured Robinson's testimony detailing his scheme with Ayeni, testimony it presented along with that of six people who cashed vouchers for Ayeni and Robinson,

several Superior Court employees who issued vouchers to Ayeni, and a handwriting expert who compared signatures on the vouchers with Robinson's and Ayeni's signatures. The government also introduced evidence indicating that Ayeni experienced financial problems at the time he allegedly ran his scheme. Ayeni adduced no evidence.

A few hours after the jury began deliberating, it sent a note to the court stating that it was "hopelessly deadlocked." Denying Ayeni's motion for a mistrial, the court invited, but did not require, the jurors to identify areas of disagreement, stating that perhaps it or counsel could help them resolve those disagreements. The jury retired and soon sent in three questions: "What is the lesser count Mr. Ayeni is charged with; why was the handwriting expert called to testify; do[ ] the defense and prosecution agree that Mr. Ayeni's signatures in the witness voucher record books are authentic?" Tr. 12/13/02 at 10, *reprinted in* J.A. at 158. With the two sides' consent, the court responded to the first question by informing the jurors that there were no lesser included offenses. That response is not at issue in this appeal.

As to the second and third questions, the court told counsel that it was inclined to give each side time to present supplemental arguments, partly because it felt it could not provide the jury with a fair and adequate response. Ayeni objected to the arguments and again moved for a mistrial, but after giving each side a day to research the issue and submit a memorandum, the court stood by its initial plan and permitted each lawyer up to ten minutes to argue, with defense counsel going first. Both before and after the attorneys argued, the district court instructed the jury not to "place undue emphasis on these supplemental arguments," Tr. 12/16/02 at 7, 18, *reprinted in* J.A. at 181, 192, but to consider them together with the evidence, instructions, and other arguments they had heard.

Shortly after the supplemental arguments, the jury sent another note, this one stating that one juror had had a brief contact with Robinson six days earlier, not long after Robinson testified, and that the juror had shared the encounter

with the other jurors. During the encounter, which occurred in a courthouse elevator, Robinson asked the juror, "[d]o you know where I can get any vouchers around here?" to which the juror responded: "I don't know anything about any—I'm new around here. I don't know what you are talking about." *Id.* at 27, *reprinted in* J.A. at 201. In response to the jury's note, the court interviewed the jurors separately, asking whether they could ignore whatever they had heard about the contact and decide the case based solely on the evidence presented. When all said they could, the judge denied Ayeni's motion for a mistrial and allowed the jurors to resume deliberations. A few hours later, the jury convicted Ayeni on all counts. The district court subsequently denied his motion for a new trial. *See United States v. Ayeni*, 245 F. Supp. 2d 145, 150 (D.D.C. 2003).

On appeal, Ayeni contends that the district court erred both in allowing the supplemental arguments and in refusing to grant a mistrial based on Robinson's contact with the juror. Because we agree with the first contention, we do not address the second.

## II.

In asserting that the district court improperly allowed supplemental arguments, Ayeni makes two alternative arguments. First, he contends that supplemental arguments in response to deliberating juries' factual questions are never permitted because they "subvert[ ] the principle . . . that the jury's deliberations must remain inviolate," Appellant's Br. at 11, and "intrude[ ] upon the jury's exclusive role as the factfinder," Appellant's Reply Br. at 3. Second, he claims that even if such supplemental arguments are sometimes permissible, in this case the district court abused its discretion by allowing them. Although the government acknowledges that the second, narrower argument is properly before us, it insists that Ayeni forfeited the first, broader argument by failing to make it in the district court.

We need not resolve the government's forfeiture argument because we agree with Ayeni that the district court abused its

discretion by allowing supplemental arguments in this case. Ayeni makes several points in advancing his narrower argument, but we begin and end with the one we deem most important: that the jury's questions necessitated no additional argument. In his opinion denying Ayeni's motion for a new trial, the district judge explained his decision to allow the supplemental arguments:

> I could have attempted to fashion an answer that characterized the government's position concerning the importance of the handwriting expert's testimony, and the parties' positions about the questioned signatures. The risk was that such an instruction from the Court, worded so as to avoid lapsing into advocacy, might not sufficiently or fairly capture the parties' nuanced positions and would be unresponsive. Alternatively, I could have simply instructed the jurors that they had to rely upon their recollection of the evidence and arguments. That would have been of no help. Helpful and responsive answers required advocacy.

*Ayeni*, 245 F. Supp. 2d at 149. Challenging this reasoning, Ayeni asserts—and the government agrees—that the jury's inquiry as to whether the two sides agreed that certain signatures were authentic could have been adequately answered with one word: "no." As to the question about why the government called the handwriting expert, Ayeni argues that "the district court could have collaborated with [the] attorneys to formulate a neutral . . . response . . . such as 'The handwriting expert was called to testify because the Government and the defendant dispute the authenticity of the signatures on the witness vouchers.' " Appellant's Reply Br. at 11. The government counters that answering this question "required a partisan slant on the evidence that the judge could not properly provide." Appellee's Br. at 27.

We agree with Ayeni that supplemental arguments were an inappropriate response to the jury's questions. The question about whether the parties agreed on the signatures' authenticity was straightforward, and the one-word answer that both sides suggest here would have provided a direct and complete

response. The other question, which sought information about the government's trial strategy, similarly called for no supplemental arguments, for the district court could have fashioned a response along the lines Ayeni suggests, or it could have told the jurors that the question was not one it could answer because trial strategy was not a proper concern of theirs. In fact, the court took just such an approach when it answered the jury's question about lesser-included offenses, telling the jurors that if they were asking which of the charges involved a shorter sentence, the court could not respond substantively because "[t]he question of possible punishment of the defendant in the event of conviction is . . . no concern of yours and should not enter or influence your deliberations in any way." Tr. 12/16/02 at 6, *reprinted in* J.A. at 180. Given these other options, it was an abuse of discretion for the district court to adopt an approach that, in effect, allowed the lawyers to hear the jury's concerns and then, as if they were sitting in the jury room themselves, fashion responses targeted precisely to those concerns. Indeed, in his supplemental argument the prosecutor made one argument to the jury that he had not made in his closing: that there was a reason why the handwriting expert had been unable to say for certain that any of the signatures on the vouchers or in the voucher sign-out book were Ayeni's, namely that the signatures were sometimes made in an automobile. The prosecutor offered this reason even though the expert herself never gave it as an explanation for her inability to match any signatures.

It is true, as the government says, that a "district court enjoys broad discretion in controlling the jury during deliberations," Appellee's Br. at 23, and that "[t]his discretion includes the authority to decide what to do when the jury encounters stumbling blocks in its deliberations," *id.* at 24. Yet this discretion has limits. For example, district courts may not ask a deliberating jury how it is numerically divided, *see Brasfield v. United States*, 272 U.S. 448, 449–50 (1926), nor (at least in this circuit) give the so-called "dynamite" or *Allen* charge used to break deadlocks, *see United States v. Thomas*, 449 F.2d 1177, 1186 (D.C. Cir. 1971) (en banc). The

issue, then, is not whether district courts have the discretion the government describes—they unquestionably do—but whether the court's action here fell within the scope of that discretion. For the reasons already discussed, we conclude that it did not.

As mentioned, Ayeni argues not only that the supplemental arguments were an abuse of discretion in this case, but also that such arguments are never permissible because they invade the jury's deliberations and intrude into its role as the sole trier of fact. Though we need not address this contention given our resolution of Ayeni's narrower claim that the supplemental arguments were an abuse of discretion under the circumstances of this case, we note our uneasiness with any use of supplemental arguments in response to a jury's factual questions. In addition to being almost unheard of—the parties cite but one case in which they were employed—the use of such arguments is, for the reasons Ayeni suggests, troubling. Accordingly, we strongly discourage the use of this innovation by the trial judges of this circuit.

Of course, the district court's error in allowing supplemental arguments would not require us to vacate Ayeni's conviction had that error been harmless. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). But the government bears the burden of proving harmless error, *see, e.g.*, *United States v. Whitmore*, 359 F.3d 609, 622 (D.C. Cir. 2004) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)), and here it does not even venture to make a harmless error argument. This is unsurprising, since there is no way to know whether the supplemental arguments produced the jury's verdict. We thus reverse Ayeni's conviction and remand for a new trial.

*So ordered.*

1

TATEL, *Circuit Judge*, concurring: "It goes without saying that few institutions are as venerable as that of trial by jury, enshrined at the Founding in the Bill of Rights and hallowed by an enormous body of English and American law that commands judges . . . not to invade the province of judgment by the people." *Stacey v. Allied Stores Corp.*, 768 F.2d 402, 406 (D.C. Cir. 1985). Implicating both that venerable institution and that command, this case presents the question whether supplemental arguments in response to juries' factual questions—a procedure so unusual that its use in a federal criminal case has apparently never been the subject of a judicial opinion—always invade the sanctity of the jury's deliberations and intrude into its acknowledged role as the exclusive trier of fact. I believe that they do, and although we need not so rule to resolve this case, *see* Op. at 7, I write separately to explain my views because jury questions more difficult to answer than those at issue here may lead other district judges to consider allowing supplemental arguments.

## I.

At the outset, I disagree with the government that Ayeni's broader argument—that supplemental arguments in response to juries' factual questions are *never* permissible—is not properly before us. To support its position, the government picks out and focuses on individual statements in the memorandum that Ayeni submitted to the district judge after the judge proposed allowing supplemental arguments. But the judge had Ayeni's entire memo, not just the sentences the government selects, so in determining whether the memorandum alerted him to Ayeni's objection and thus gave him an "opportunity to correct any mistake before an appeal is taken," *United States v. Edelin*, 996 F.2d 1238, 1245 (D.C. Cir. 1993) (per curiam), we too must examine the whole memo, *cf. Estelle v. McGuire*, 502 U.S. 62, 72 (1991) ("It is well established that [a challenged jury] instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole. . . ." (internal quotation marks omitted)); *United States v. Whoie*, 925 F.2d 1481, 1485 (D.C. Cir. 1991) ("In deciding whether jury instructions are erroneous, we always consider the whole instruction—not just the supposedly erroneous snippet.").

Once Ayeni's memo is read in its entirety, it becomes clear that he made the argument that the government says he forfeited. The memo is replete with general attacks on the propriety of allowing supplemental arguments in response to juries' factual questions. For example, noting that "the last two questions posed by the jury ask the Court and both counsel to make factual conclusions for the jurors," Ayeni stated flatly that "[t]his is clearly improper." Def.'s Resp. to the Gov't's Mem. of Law Concerning (I) Propriety of Providing Supplemental Jury Instruction for Second Degree Fraud and (II) Propriety of Providing Supplemental Closing Argument in Resp. to Specific Jury Request at 2, *United States v. Ayeni* (No. 02–009–01) [hereinafter Def.'s Memo]. Expanding on this point, Ayeni asserted that "[t]o impose upon counsel ... the requirement that we explain the meaning of the expert's testimony to the jury is in essence telling the jurors how to deliberate. It is their duty to weigh the evidence and give each piece of evidence the weight they think it deserves." *Id.* And still later, Ayeni added that "[t]he Court, via supplemental arguments after closing, is now specifically delegating this [fact-finding] task to counsel ... The Court's attempts to force counsel to 'do the juror[s'] thinking for them' and tell them what the facts are after they are unable to agree on the facts after careful deliberations is clearly inappropriate." *Id.* at 3. Demonstrating that Ayeni was advancing a generic objection to the use of supplemental arguments in response to juries' factual questions, these statements broadly condemn such arguments in terms (and for reasons) that would apply in almost any case.

The language that the government's forfeiture argument relies on—all of which appears in the memo's first paragraph—does nothing to alter this overall message. True, the memo "concedes that the Court has broad discretion to permit supplemental closing argument in response to notes from the jury." Def's Memo at 1. Read in light of the sentences that follow, however, that "concession" merely acknowledges that appellate courts have sanctioned (or even required) supplemental arguments when a jury note leads the judge to give supplemental instructions. *See, e.g.*, *United States v. Fontenot*, 14 F.3d 1364, 1368 (9th Cir. 1994) ("[I]f a

supplemental jury instruction given in response to a jury's question introduces a new theory to the case, the parties should be given an opportunity to argue the new theory."). As the memo's next two sentences explain, Ayeni had no objection to the cases the government cited in its memorandum—cases that involved supplemental arguments following supplemental instructions. In other words, Ayeni "conceded" only that there are circumstances in which supplemental arguments are allowed, not that the situation here was one of those circumstances. The government sees Ayeni's failure to object to the cases cited in its memo as further evidence of forfeiture, but not one of those cases involved arguments in response to a jury's factual questions. Ayeni's failure to object to those cases cannot fairly be viewed as forfeiting an issue that they did not address.

To be sure, other language in Ayeni's memorandum (not cited by the government) does make a case-specific argument. But viewed together with the more general statements quoted above, this means only that Ayeni made two alternative arguments: the broader claim that supplemental arguments are never permitted in response to juries' factual questions, and the narrower assertion—which the court addresses—that such arguments, even if permissible, were improper in this case. A party making such alternative arguments does not, of course, forfeit either one.

More generally, our job is not, as the government seems to think, to see how creatively we can read pleadings in order to avoid deciding an issue. Rather, particularly when reviewing a criminal conviction where a person's freedom is at stake, we must address every fairly raised issue. For that reason, this circuit has made clear that "where the record is ambiguous we would rather err on the side of recognizing an objection that was not made with the desired specificity than rejecting one that was so made." *United States v. Purvis*, 21 F.3d 1128, 1130 (D.C. Cir. 1994).

## II.

Two bedrock characteristics of our system of trial by jury, a system the Supreme Court has labeled "fundamental to the

American scheme of justice," *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968), are that jury deliberations occur in seclusion and that the jury serves as the sole finder of fact. Regarding the first characteristic, not only is "the sanctity of jury deliberations . . . a basic tenet of our system of criminal justice," *United States v. Schwarz*, 283 F.3d 76, 97 (2d Cir. 2002), but courts go to great lengths to protect that sanctity. For example, warning district courts to be chary when questioning jurors who may be hindering deliberations, this court has explained that "a court may not delve deeply into a juror's motivations because it may not intrude on the secrecy of the jury's deliberations." *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987). Along the same lines, other circuits have reversed convictions simply because an alternate juror sat silently in the jury room during deliberations, with one court stating that "the presence of the alternate in the jury room violated the cardinal principle that the deliberations of the jury shall remain private and secret in every case. The presence of any person other than the jurors to whom the case has been submitted . . . impinges upon that privacy and secrecy," *see United States v. Va. Erection Corp.*, 335 F.2d 868, 872 (4th Cir. 1964) (footnote omitted), and another observing that "[o]nce the prescribed number of jurors becomes 'the jury,' then, and immediately, any other persons are strangers to its proceedings. Their presence destroys the sanctity of the jury and a mistrial is necessary," *United States v. Beasley*, 464 F.2d 468, 470 (10th Cir. 1972). Congress too has taken steps to protect jury deliberations, making it a crime to record, watch, or listen to any federal jury's deliberations (or to attempt to do so). *See* 18 U.S.C. § 1508 (2000).

No less fundamental than jury seclusion is the principle that the jury—not the trial judge and not the attorneys—serves as the trier of fact. As the Supreme Court has said:

> Of course, . . . in a jury trial the primary finders of fact are the jurors. Their overriding responsibility is to stand between the accused and a potentially arbitrary or abusive Government that is in command

of the criminal sanction. For this reason, a trial judge is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict, regardless of how overwhelmingly the evidence may point in that direction. The trial judge is thereby barred from attempting to override or interfere with the jurors' independent judgment in a manner contrary to the interests of the accused.

*United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73 (1977) (citations omitted). This court has also emphasized the importance of the jury as fact-finder. Indeed, "our opinions have repeatedly emphasized our conviction that the jury's role as fact-finder is . . . central to our jurisprudence." *United States v. Comer*, 421 F.2d 1149, 1154 (D.C. Cir. 1970); *see also Belton v. United States*, 382 F.2d 150, 156 (D.C. Cir. 1967) ("[T]he principle that the jury should be permitted to find the facts is a cornerstone of our jurisprudence. . . ."). Underscoring the importance of that role, this court, sitting en banc, has declared that "[a]ny undue intrusion by the trial judge into this exclusive province of the jury is error of the first magnitude." *United States v. Thomas*, 449 F.2d 1177, 1181 (D.C. Cir. 1971) (en banc).

In my view, supplemental arguments in response to juries' factual questions conflict with these hallmarks of the jury system. Such arguments give attorneys who, in effect, have "peeked" into the jury's deliberations—by listening to its questions and hearing its concerns—an opportunity to provide tailored responses to those questions, questions that concern factual matters and that the jurors formulated as part of their deliberative process. The arguments thus permit the lawyers to effectively participate in the jury's deliberations, almost as if they were in the jury room itself. Indeed, had the supplemental arguments in this case been permissible, then nothing would have prevented the jury from submitting additional factual questions to the court, or the court from permitting additional rounds of such arguments, thus launching an ongoing dialogue between jury and lawyers. Though no extended dialogue was needed to produce a verdict in this case, the fact remains that the jury convicted

Ayeni only after the attorneys contributed to its deliberations, intruding on its role as sole fact-finder. Of course, no one told the jury which facts to find, but the jury's role as fact-finder can be invaded without being completely usurped. Juries find facts via a deliberative process that takes place in seclusion, and when counsel offer arguments tailored to address the factual concerns that arise during that deliberative process, the process—and thus the jury's role as sole fact-finder—has been invaded.

Contrary to the government's suggestion, the fact that courts permit or even require supplemental arguments when a trial judge provides supplemental legal instructions does not justify the use of such arguments in response to factual questions. Juries' legal questions, which are what usually prompt supplemental instructions, differ fundamentally from their factual questions for an obvious reason: juries do not serve as the "triers of law." They are not expected to divine the law for themselves the way they are expected to find the facts. Rather, the trial judge, aided by counsel, provides the jury with the proper legal standard. *See, e.g.*, *Kelly v. South Carolina*, 534 U.S. 246, 256 (2002) ("A trial judge's duty is to give instructions sufficient to explain the law . . . ."). Indeed, "[w]hen a jury makes explicit its [legal] difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612–13 (1946).

By contrast, where a jury's questions relate to a factual matter, a substantive reply (whether by the judge or the attorneys) risks interfering with the jury's exclusive responsibility for resolving factual questions. For this reason, several circuits have upheld district courts that refused to answer juries' factual questions. In one case, for example, the district court told jurors who submitted factual questions, "[m]embers of the jury: The Court cannot answer your questions. It is for you as fact finders to interpret the evidence, weigh it and evaluate it without further directions from the Court. Please proceed with your deliberations." *United States v. Aubin*, 961 F.2d 980, 983 (1st Cir. 1992) (quoting the district court) (internal quotation marks omitted). Sustaining the district court's actions, the First Circuit

explained that "[t]he jury questions sought to resolve a conflict among the jurors as to what the testimony had been; such a conflict must be resolved by the trier of fact." *Id.*; *see also United States v. Blumberg*, 961 F.2d 787, 790 (8th Cir. 1992) (finding no abuse of discretion where the district court, having received a factual question from the jury and "[b]elieving further instruction would invade the province of the jury as the ultimate fact finder, . . . told the jurors they should answer the question for themselves by examining the evidence"). Courts have also warned trial judges against usurping the jury's fact-finding role even as they carry out their obligation to clear up the jury's legal difficulties. For instance, after explaining the importance of answering a jury's legal questions, the Fourth Circuit cautioned that " 'the court must be careful not to invade the jury's province as fact finder.' Such a distinction is consistent with our fundamental belief that it is the court that provides the legal yardstick and the jury that measures the evidence." *United States v. Ellis*, 121 F.3d 908, 925 (4th Cir. 1997) (quoting *Blumberg*, 961 F.2d at 790) (citation omitted); *see also United States v. Nunez*, 889 F.2d 1564, 1569 (6th Cir. 1989) ("Questions from a deliberating jury present a dilemma for a trial court. The court must be careful not to invade the jury's province as fact-finder. Nevertheless, the court must respond to questions concerning important legal issues."); *United States v. Walker*, 575 F.2d 209, 214 (9th Cir. 1978) (Kennedy, J.) ("Because the jury may not enlist the court as its partner in the fact-finding process, the trial judge must proceed circumspectly in responding to inquiries from the jury.").

Of course, where a jury's legal question leads the judge to give supplemental instructions, supplemental arguments may be appropriate if the instructions introduce legal theories or concepts about which the parties never had a chance to argue. *See, e.g.*, *Loveless v. United States*, 260 F.2d 487, 487–88 (D.C. Cir. 1958) (per curiam) (reversing a conviction because the district court refused to allow additional argument after providing supplemental instructions regarding a lesser offense—manslaughter—that was not mentioned in the original instruction). But while lawyers often address the facts when

arguing in response to a supplemental instruction, they do so only in relation to legal questions, not factual ones. For example, in a case cited by the government, the jury asked whether the defendant could be convicted of first-degree murder even if he had not (1) inflicted the fatal injury himself, (2) planned the murder, and (3) been the only one to premeditate the murder. *See United States v. Horton*, 921 F.2d 540, 542–43 (4th Cir. 1990). Such *legal* questions reveal the jury's uncertainty about the law. Attorneys who argue in response to supplemental instructions induced by such questions will not know of any factual disputes that might be dividing the jury, and will thus be unable to focus their arguments on such disputes.

This case shows exactly how supplemental arguments in response to juries' factual questions permit attorneys to focus on factual issues, indeed on the very factual issues that are dividing the jury and preventing a verdict (since juries are unlikely to ask questions about issues on which they agree). Recall that in seeking to prove that Ayeni defrauded the D.C. Superior Court by obtaining almost 2,000 witness-fee vouchers and having them redeemed by individuals who never appeared as witnesses, the government called (among others) a handwriting expert to testify that it was indeed Ayeni who had signed out all the vouchers. On cross-examination, the expert acknowledged that she could not say for certain that any of the signatures in the voucher sign-out book were Ayeni's. It seems clear from the jury's questions that this concession caused the deadlock, with some jurors evidently believing that the concession meant that the government had failed to prove Ayeni's guilt beyond a reasonable doubt. This was hardly surprising, given that in his closing argument the prosecutor offered the jurors no explanation for the concession. Indeed, he failed to mention it at all in his closing even though Ayeni's counsel not only highlighted the concession in his closing, but also argued that by itself it created reasonable doubt. *See* Tr. 12/12/02 at 95–96, *reprinted in* J.A. at 142–43 ("So we bring in the President's own document handwriting examiner . . . . I said, Ms. King have you verified one of those signatures with virtual certainty was Mr. Ayeni's? No, not a

one. Well, why not? Forget all the curves and graphs. Why not? There's a reasonable doubt, ladies and gentlemen. If they are his signatures, why didn't she simpl[y] classify them as a virtual certainty, hit the highest classification, case over." (paragraph break omitted)). The jury thus began its deliberations with nothing to counter Ayeni's argument that the expert's failure to match any signatures constituted reasonable doubt. And apparently at least some jurors found merit in the argument, leading them to wonder why the government had even called the expert, and to ask that very question when invited to voice their concerns.

Having heard the jury's concerns, and thus been alerted to the precise weakness in his presentation of the case, the prosecutor took full advantage of the opportunity provided by the supplemental arguments to correct his earlier mistake— he gave the jury a response to defense counsel's argument unlike anything he had said in his closing. The expert, he said to the jury:

> told you ... that she could not be absolutely certain. Well, why is that? You know these voucher sign-out logs are signed at a counter, and they are signed in a hurry frequently. You know that the vouchers ... were often signed by Mr. Ayeni in his automobile. Of course she can't be absolutely certain. That's not a shock or a surprise.

Tr. 12/16/02 at 13, *reprinted* in J.A. at 187. So whereas in his closing the prosecutor had given the jury absolutely no explanation for the expert's inability to match any signatures, in his supplemental argument made after the jury voiced its concerns about the expert—concerns relating to a factual matter that were developed via the deliberative process—the prosecutor not only provided a reason (that the vouchers were often signed hurriedly, sometimes at a counter and sometimes in a car), but also made it sound as if the reason was obvious.

In case this new explanation for the expert's concession failed to convince the jurors, the prosecutor offered a second argument targeted precisely at the key factual issue causing

the deadlock. This argument—which, though not completely new, was significantly more focused than what the prosecutor had said in his closing—consisted of telling the jurors that if the expert's testimony bothered them, they could simply forget it. "Think with me for a moment, if you will," he said. "If we had never called the handwriting expert in this case at all, if you had never heard her name, if you had never heard that she had done any analysis on this, . . . you would still have many roads by which to achieve the destination of being firmly convinced." *Id.*, *reprinted in* J.A. at 185. In his closing, the prosecutor had said nothing quite so direct. In fact, only in discussing a different witness, Troy Robinson, had the prosecutor used similar language. "I submit that you don't even need Troy Robinson's testimony to prove beyond any reasonable doubt that this man is guilty as charged." Tr. 12/12/02 (p.m.) at 82; *see also id.* at 103–04 ("I told you in the opening phase of my closing argument that you could go back into the jury room and if Troy Robinson never walked into this courtroom you would have sufficient evidence, in fact more than enough evidence, to find this gentleman guilty beyond a reasonable doubt."). Moreover, while the prosecutor had made a point in his closing similar to the "many roads" statement, he did not make it in connection with his discussion of the handwriting expert, instead relying on the jury to put the two points together. In his supplemental argument, by contrast, the prosecutor expressly linked the two points.

To be sure, neither of these arguments, nor anything else the prosecutor or Ayeni's counsel said during the supplemental arguments, was inherently inappropriate. Both of the prosecutor's points, and everything else the two lawyers told the jury, could properly have been included in their closings. In that circumstance, however, each lawyer would have been speaking purely as an advocate presenting his case to jurors whose factual concerns he knew nothing about, rather than as a "quasi-juror" offering targeted responses to questions about factual matters that other jurors had formulated during their deliberations. It is not simply the content of what lawyers say during supplemental arguments that matters, in other

words, but the context in which they say it. The context of the arguments here, i.e., in response to a jury's factual questions, rendered them improper.

It is true, as the government points out, that the district court gave both sides equal time to argue, but that in no way mitigates the problems with having the attorneys participate in the jury's deliberations. Our system does not permit trial by a jury equally divided between advocates for the prosecution and advocates for the defense. We require trial by an impartial jury, something that cannot be created by balancing jurors partial to one side against jurors partial to the other. Defendants have a right to panels composed entirely of impartial jurors. *See Parker v. Gladden*, 385 U.S. 363, 366 (1966) (per curiam) ("[P]etitioner was entitled to be tried by 12 . . . impartial and unprejudiced jurors."); *Jackson v. United States*, 395 F.2d 615, 618 (D.C. Cir. 1968) ("Kemper's presence on the jury . . . had such a strong tendency to deny him a trial by *twelve impartial jurors* . . . that we are constrained to order a new trial." (emphasis added)).

The problems that flow from allowing supplemental arguments in response to factual questions—intrusion into the jury's deliberations and invasion of its fact-finding role—may explain why such arguments have almost never been used in this country. The parties cite no criminal case in which they were employed, and just one civil case, *Withers v. Ringlein*, 745 F. Supp. 1272 (E.D. Mich. 1990). My own research uncovered only one other such case, *see State v. Sabala*, 943 P.2d 776, 778 (Ariz. 1997), but that arose in Arizona, which amended its rules of criminal procedure to authorize such arguments expressly, *see State v. Patterson*, 56 P.3d 1097, 1098–99 (Ariz. Ct. App. 2002) (discussing Arizona Rule of Criminal Procedure 22.4 and the process that yielded it). I also found a Massachusetts case in which the trial judge invited deadlocked jurors to pose questions that the attorneys could address with supplemental arguments. *See Commonwealth v. Gomez*, 770 N.E.2d 477, 479 (Mass. App. Ct. 2002). In that case, however, the prosecutor not only objected "that the proposed procedure would intrude upon the function and province of a deliberating jury and would impermissibly

attempt to find out where the jurors stood," *id.*, but also brought a joint petition for an emergency injunction barring such arguments to a justice of the state's highest court, a petition the justice granted, *see id.* at 480. In short, it seems that virtually all judges throughout our history have deemed supplemental arguments in response to juries' factual questions improper (or simply not permitted).

In departing from this consensus, the district judge here was driven partly by his concern that offering his own response to the jury's questions would either be unfair to one side or else unhelpful. *See* Op. at 5. The concern about crafting an unbalanced answer had merit, but the concern about an unhelpful answer much less so. Put simply, not every jury question requires a substantive answer. *See supra* pages 6–7; *see also Ellis*, 121 F.3d at 925 (upholding the district court's refusal to answer the question "[w]ho are the two men standing next to each other in the photograph that is marked Defendant's Exhibit #12?"). This does not mean that the district court here had no choice but to declare a mistrial as soon as the jurors reported being "hopelessly deadlocked." It could have, as we have explained, *see op.* at 5–6, simply answered "no" to the signature-authenticity question and told the jurors that it could not answer the question about why the expert testified. Or it could have given them the anti-deadlock charge that this court approved in *United States v. Thomas*, 449 F.2d at 1186. It could not, however, attempt to avoid a mistrial by allowing the attorneys to invade the jury's deliberations and fact-finding process. Indeed, if a desire to prevent mistrials (and hence to preserve judicial resources) could alone justify steps to break a deadlock, then this court would not have proscribed use of the anti-deadlock instruction named after *Allen v. United States*, 164 U.S. 492 (1896), *see Thomas*, 449 F.2d at 1186, for that charge similarly induces more verdicts and thus reduces the number of mistrials.

More generally, a mistrial—the result the district court here sought to prevent—plays an important and healthy role in our criminal justice system. "A mistrial from a hung jury is a safeguard to liberty. In many areas it is the sole means

by which one or a few may stand out against an overwhelming contemporary public sentiment. Nothing should interfere with its exercise." *Green v. United States*, 309 F.2d 852, 854 n.3 (5th Cir. 1962) (Wisdom, J.) (quoting *Huffman v. United States*, 297 F.2d 754, 759 (5th Cir. 1962) (Brown, J., dissenting)) (internal quotation marks omitted); *see also Johnson v. Hardin*, 926 S.W.2d 236, 243 (Tenn. 1996) (same); *State v. Martin*, 211 N.W.2d 765, 769 (Minn. 1973) (same); *Fields v. State*, 487 P.2d 831, 837 (Alaska 1971) ("A hung jury is a legitimate end of a criminal trial . . . ."), *quoted in State v. Kaiser*, 504 N.W.2d 96, 99 (S.D. 1993). In this circuit, Judge Skelly Wright voiced a similar view in his dissent in *Jenkins v. United States*, 330 F.2d 220 (D.C. Cir. 1964) (per curiam), a case in which the trial judge told deadlocked jurors that they "have got to reach a decision in this case . . . . It is a simple case," *id.* at 221 n.2 (Wright, J., dissenting). Although Judge Wright's view that "a hung jury can be a safeguard to liberty," *id.* at 222, failed to sway his colleagues, the Supreme Court vindicated his position when it reversed the conviction on the ground that the trial judge's comment was impermissibly coercive, *see Jenkins v. United States*, 380 U.S. 445, 445–46 (1965) (per curiam). In short, "a mistrial is as much a part of the jury system as a unanimous verdict," *Williams v. United States*, 338 F.2d 530, 533 (D.C. Cir. 1964); *see also State v. Marsh*, 490 P.2d 491, 503 (Ore. 1971) ("[T]he possibility of a hung jury based upon an honest difference in opinion[ ] is part and parcel of our jury system."), and while reducing their number would certainly bring some efficiency gains, our decision, as the Supreme Court recently put it, "cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice," *Blakely v. Washington*, 542 U.S. ___, 2004 WL 1402697, *9 (June 24, 2004). This court made the same point over thirty years ago when banning the *Allen* charge:

> Particularly in these days of burgeoning litigation, we share the trial judge's sensitivity to the need for adjustment of judicial processes to the point of highest efficiency. But while there is need to expedite the work of the courts, this cannot be at the

> expense of the call of conscience. Indeed, it may well be that a hung jury might lead the prosecutor to reconsider whether the case, particularly a close or weak case, should be presented again to a jury— so that a mistrial need not necessarily "require" a retrial, as the trial judge told the jurors.

*Thomas*, 449 F.2d at 1183–84. Just as efficiency cannot come "at the expense of the call of conscience," *id.* at 1184, neither can it come at the expense of vital constitutional protections.

In saying this, I do not mean to suggest that supplemental arguments in response to factual questions necessarily infringe "vital constitutional protections." Although doubting their validity, I am unprepared to foreclose the possibility that such arguments actually represent a worthwhile innovation. But given the extent to which they intrude into the jury's role as exclusive fact-finder, and given that the nation's judicial system has a two-hundred-plus-year history of conducting trials without them, I believe they should be adopted, if at all, not by individual judges in the middle of trials, but through some formal procedure, such as legislation or amendments to the rules of criminal procedure, the route Arizona took. *See Pan Am. World Airways v. United States Dist. Court*, 523 F.2d 1073, 1078 (9th Cir. 1975) ("[A] procedure that deviates so sharply from the traditional role of the judiciary cannot be justified as an ad hoc rule of practice."). A more formal procedure would permit the kind of rigorous and thorough examination of the benefits and drawbacks of supplemental arguments that so novel and untested a change in longstanding jury procedures requires. *Cf.* 12 CHARLES ALLEN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3152 (2d ed. 1997) (describing the "extremely careful" process by which the Federal Rules of Civil Procedure are amended, a process "calculated to ensure that any changes reflect the best thinking of the entire profession").